**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **DAVID CRAWFORD,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:22-CV-02542-JAR-GEB** |
| **THE GUARANTY STATE BANK & TRUST COMPANY, and EXECUTIVE SALARY CONTINUATION PLAN FOR THE GUARANTY STATE BANK & TRUST COMPANY, through the Board of Directors of The Guaranty State Bank & Trust Company as Plan Administrator and Named Fiduciary,** | |
| **Defendants.** | |

<u>**MEMORANDUM AND ORDER**</u>

Plaintiff David Crawford brings this lawsuit against his former employer, The Guaranty State Bank & Trust Company ("the Bank"), and The Executive Salary Continuation Plan for the Bank through its Board of Directors, as Plan Administrator and Named Fiduciary ("the Board") under the Employee Retirement Income Security Act of 1974, as amended[1] ("ERISA"), seeking to recover benefits due to him under an employee benefit plan (the "Plan").[2]  Defendants assert five counterclaims against Plaintiff for recoupment on the basis of fraudulent misrepresentation and omission, conversion, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and negligence under Kansas law.[3]  This matter is before the Court on Plaintiff's Motion to Dismiss for Failure to State a Claim or in the Alternative a Motion to Stay Consideration of Defendants' Counterclaims Pending Resolution of a Parallel State Court Proceeding (Doc. 14).

---

[1] 29 U.S.C. § 1001 *et seq.*

[2] Doc. 1.

[3] Doc. 11.

This motion is fully briefed, and the Court is prepared to rule.  For the reasons set forth below, the Court denies Plaintiff's motion.

## I.  Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level"[4] and must include "enough facts to state a claim for relief that is plausible on its face."[5] "In determining whether a counterclaim should be dismissed pursuant to Rule 12(b)(6), the court applies the same standards as applied in considering a motion to dismiss a complaint for failure to state a claim for relief."[6]  Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[7]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[8]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[9]  Finally, the court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[10]

---

[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 235–36 (3d ed. 2004)).

[5] *Id.* at 570.

[6] *Jones v. Addictive Behavioral Change Health Grp., LLC*, 364 F. Supp. 3d 1257, 1265 (D. Kan. 2019) (citing *Ramada Franchise Sys., Inc. v. Tresprop, Ltd.*, 75 F. Supp. 2d 1205, 1208 (D. Kan. 1999)).

[7] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[9] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[10] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[11]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[12]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[13]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[14]

## II.   Background

The following facts are alleged in Defendants' Answer and Counterclaim for Recoupment.[15]  For the purposes of deciding this motion, the Court assumes these facts to be true and construes them in the light most favorable to Defendants.

### A.   Plaintiff's Employment at the Bank

Plaintiff began working for the Bank in 1990 as an agricultural Loan Officer.  He was promoted to Senior Vice President in 2002 and had a large loan portfolio with substantial discretion and control over extending loans to various businesses and individuals.  The majority of Plaintiff's work was in cattle financing.  Plaintiff tendered his resignation with the Bank on April 13, 2020.  After Plaintiff resigned, Defendants learned that Plaintiff had used his position

---

[11] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[12] *Id.* at 678–79.

[13] *Id.* at 679.

[14] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

[15] Doc. 11.

of authority to perform fraud and self-dealing relating to cattle and feedlot loans on a number of occasions.

### 1.   The 2014 Incident

First, in 2014, Greg Koenigsman, a long-time borrower of the Bank whose account was administered by Plaintiff, wrote a check on his checking account with the Bank, payable to Plaintiff for $3,033.46, indicating that the payment was for "proceeds from fats."  When the Bank asked Plaintiff about this check, Plaintiff stated that he had an arrangement with Koenigsman whereby they agreed to share in the profits and losses from that group of cattle. The Bank informed Plaintiff that this was a conflict of interest and a violation of the Bank's policies.  Plaintiff apologized and assured the Bank that he had not partnered with any other customers of the Bank in any other cattle arrangements.

### 2.   The 2018 Incident

Second, in August 2018, Plaintiff advanced a loan of $2,112,860.30 from the Bank to Ottawa County Feedlot ("OCF") to finance the delivery and acquisition of 2,424 head of cattle. However, Plaintiff never attempted to verify the existence of the cattle, as required by the Bank's policies.  When Plaintiff and another loan officer, Kirk Berneking, travelled to Allen Leidig's farm where the cattle were supposed to be, they discovered that there were no cattle there.  At that point, Leidig—the majority owner of OFC—admitted that the cattle never existed.  This incident resulted in the Bank being forced to charge off over $2,300,000 and, after recoveries from the sale of collateral, the loss to the Bank amounted to $400,000, plus interest and attorneys' fees.

### 3. The 2019 Incident

Third, in 2019, Plaintiff failed to report a number of losses to the Bank from loans he administered and monitored. The loans at issue were to Mark Feiling, a cattle rancher, Mike Nix, the owner and operator of a livestock auction business, and Chad Draper, the owner of a cattle backgrounding and feeding operation. Feiling's and Nix's loans were secured by interests in their cattle, and Draper's lot was secured by an interest in his feedlot, equipment, and real estate. The three worked together: Feiling and Nix shipped their cattle to Draper to feed and care for them and to keep the cattle sorted by owner.

In March 2019, Draper told Nix that approximately 700 of Nix's cattle died and that he was out of money to purchase feed for the remaining cattle. Nix went to personally inspect his cattle and, after noticing many more were missing, he shipped those that were left to another location to be sold at an auction. As a result of this loss, he was unable to repay his loan to the Bank and, therefore, the Bank was forced to charge off $600,000 plus interest and attorneys' fees. Plaintiff did not report this loss to the Bank. In April 2019, Feiling went to inspect his cattle at Draper's lot. He discovered that nearly 1,000 of his cattle were missing. As a result of this loss, he was unable to repay his loan to the Bank, resulting in the Bank being forced to charge off $1,000,000 plus interest and attorneys' fees. Again, Plaintiff did not report this loss to the Bank. Before the Bank became aware of these losses, Draper sold his feedlot and repaid his remaining loan to the Bank, which was approximately $170,000.

### B. The Investigation

The Bank learned of these losses when other loan officers, Tony King, Clint Shoemaker, and Kent Bruna, conducted an inspection and found that approximately 1,660 head of cattle were missing from Draper's feedlot. The loan officers called the local Sheriff to inform him of the

situation and report what they thought was either missing or stolen cattle.  Sheriff Parsons

reached out to the Kansas Bureau of Investigations ("KBI") to assist him in investigating these

missing or stolen cattle.

This investigation began in December 2019 when Sheriff Parsons interviewed Draper.

Draper claimed in this interview that the loss of cattle was due to death rates.  Draper later

informed the KBI that Plaintiff repeatedly pressured him to continue operating despite these

death rates and accounting problems, telling him that the numbers would eventually even out.

Draper also told the KBI that when he informed Plaintiff about the high death rate of the cattle,

Plaintiff told him to sell the feedlot before informing Feiling, and to use that money to pay back

the Bank's loan interest.  Plaintiff told Draper not to tell the Bank about the high death rates at

the feedlot and that Plaintiff would help Draper conceal the deaths from both the Bank and

Feiling.

During its investigation, the KBI also learned that Plaintiff and Nix had a secret

partnership on the cattle that were being fed at the Draper lot.  First, Draper informed the KBI

that Plaintiff told him to only contact him on his personal phone, not his work phone, if there was

a problem with Nix's cattle.  Then, the KBI discovered personal checks from Plaintiff to Nix and

vice versa, which they believed to be effectuating the transfer of cattle and cattle proceeds

between the two.  Plaintiff confirmed this theory to the KBI, explaining that he and Nix had a

relationship whereby Plaintiff would receive either fifteen or twenty percent of the profit or loss

incurred on the cattle that Nix was feeding at Draper's lot.  Nix also confirmed this relationship

to the KBI.  The Bank had no prior knowledge of this relationship between Nix and Plaintiff—

which constituted a direct conflict of interest by Plaintiff and a breach of the Bank's trust—until

the KBI issued its report and conclusions on September 14, 2021 (the "KBI Report").

### C.    Termination of Plaintiff's Benefits under the Plan

As stated above, Plaintiff resigned from the Bank well before the KBI Report was issued in September 2021.  After reading the KBI Report, Defendants determined that Plaintiff was ineligible for the benefits under the Plan based on the fraud and misrepresentation perpetrated by Plaintiff as detailed in the KBI Report.  Defendants explained this to Plaintiff in a First Bank Letter dated September 28, 2021, specifically pointing to the language in the Plan which provides that "in the event the Executive shall be discharged for cause at any time (or if grounds 'for cause' exist at the time the Executive's employment terminates for any reason), all benefits provided herein shall be forfeited."[16]

### D.    Plaintiff's Lawsuit and Defendants' Counterclaims

After learning that his benefits were terminated under the Plan, Plaintiff brought this lawsuit asserting a claim for benefits under ERISA § 502(a)(1)(B).[17]  In his Complaint, Plaintiff seeks: (1) a declaration that his forfeited retirement benefits under the Plan of $757,800 paid in monthly installments of $4,210 over 180 months should be restored to him; (2) an order that Defendants restore and pay his forfeited and reduced retirement benefits; (3) an order that Defendants immediately pay him any amounts owed from December 2021 to the date of judgment; and (4) an award for his costs, disbursements, expenses, and attorney's fees.

Defendants filed an Answer to Plaintiff's Complaint, which included affirmative defenses and five counterclaims: (1) Recoupment for Fraudulent Misrepresentation and Omission; (2) Recoupment for Conversion; (3) Recoupment for Breach of Fiduciary Duty; (4) Recoupment for Breach of the Duty of Good Faith and Fair Dealing; and (5) Recoupment for Negligence.[18]

---

[16] Doc. 11-1 at § V(E).

[17] Doc. 1.

[18] Doc. 11.

### III.    Discussion

### A.    ERISA Preemption

Plaintiff moves to dismiss Defendants' state law counterclaims on the basis that they are preempted under ERISA.  ERISA contains a broad preemption provision providing that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[19]  There are two types of ERISA preemption: complete and conflict.  Under the doctrine of complete preemption, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive."[20]  Under the doctrine of conflict preemption, "ERISA preempts state laws that 'relate to' employee benefit plans."[21]  Plaintiff bears the burden of proving as a matter of law that ERISA preempts Defendants' counterclaims.[22]  Here, Plaintiff asserts that Defendants' counterclaims are preempted under both doctrines.  The Court addresses each in turn.

### 1.    Complete Preemption

The Supreme Court has established a two-part test for determining when ERISA completely preempts a state-law claim.[23]  Both must be satisfied in order for the Court to find complete preemption.[24]  First, the Court must ask whether the claimant "could have brought his claim under ERISA § 502(a)[]."[25]  "A claim meets the first prong of the *Davila* test if it asserts

---

[19] *Ellis v. Liberty Life Assur. Co.*, 958 F.3d 1271, 1278 (10th Cir. 2020) (citing 29 U.S.C. § 1144(a)).

[20] *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

[21] *Pacificare of Okla. v. Burrage*, 59 F.3d 151, 153 (10th Cir. 1995) (citing 29 U.S.C. § 1144(a)).

[22] *See It's Greek to Me, Inc. v. Fisher*, No. 17-4084-KHV, 2018 WL 953111, at *4 (D. Kan. Feb. 20, 2018).

[23] *Davila*, 542 U.S. at 210.

[24] *Id.*

[25] *Id.* at 211.

rights to which the [claimant] is entitled 'only because of the terms of an ERISA-regulated employee benefit plan.'"[26]  Assuming the first prong is met, the Court must then determine whether the claim implicates a "legal duty . . . independent of ERISA or the plan terms."[27]  To do so, the Court must review the claimant's allegations alongside the state law upon which they are based.[28]  If "interpretation of the terms of [a] benefit plan[] forms an essential part" of the claim, the second prong of *Davila* is satisfied.[29]

Under the first *Davila* prong, the Court must determine whether Defendants could have brought their counterclaims under ERISA § 502(a).  The only subsection of Section 502(a) that could arguably apply provides: "A civil action may be brought . . . by a participant, beneficiary, or fiduciary . . . to obtain other appropriate equitable relief to . . . enforce any provisions of this title or the terms of the plan."[30]  Thus, the first question raised by the text of section 502(a)(1)(B) is whether Defendants are "participants," "beneficiaries," or "fiduciaries," and, if so, the second question is whether they are seeking appropriate equitable relief to enforce the terms of the plan. If the answer to both questions is yes, the first *Davila* prong is met, and the Court should move on to the second.

Plaintiff's position appears to be that each Defendant qualifies as either a participant, a beneficiary, or a fiduciary.  The Bank concedes that it is a beneficiary,[31] and it is clear from the

---

[26] *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1135 (10th Cir. 2014) (quoting *Davila*, 542 U.S. at 210).

[27] *Davila*, 542 U.S. at 210.

[28] *Id*. at 211–13.

[29] *Id*. at 213.

[30] ERISA, Pub. L. 93-406, Title I, § 502(a)(3)(B)(ii), codified at 29 U.S.C. § 1332(a)(3)(B)(ii).

[31] *See* Doc. 18 at 10 (arguing that "a Complaint based on common law banking and cattle fraud and a breach of fiduciary duty, which sought only to recover amounts for that fraud and breach, would not be preempted by ERISA *even though . . . Counterclaim Defendant [is] beneficiary of a qualified retirement plan.*") (emphasis added)).

Plan that the Board is a fiduciary.[32]  Therefore, the Court turns next to whether Defendants are seeking equitable relief to enforce the terms of the Plan.  Interestingly, Plaintiff argues that Defendants are not seeking equitable relief[33]—thereby negating its own argument that, at least as far as the first *Davila* prong goes, Defendants' claims are completely preempted.  Defendants point this out, arguing that Plaintiff "seems to concede explicitly that the Counterclaims could not be brought under ERISA's remedial scheme," and pointing to Plaintiff's argument that the counterclaims do not constitute equitable relief.[34]  The Court agrees with both parties—Defendants' counterclaims do not constitute an action for equitable relief.  While the doctrine of recoupment is generally considered equitable in nature, it is an affirmative defense rather than an independent claim for relief.[35]

Based on these findings, the Court concludes that the first *Davila* prong is not met in this case.  Therefore, Defendants' counterclaims cannot be completely preempted by ERISA, and the Court need not consider the second *Davila* prong.  The Court turns instead to whether Defendants' counterclaims are subject to conflict preemption.

---

[32] *See* Doc. 11-1, § X(A) ("As Named Fiduciary and Plan Administrator, the Board shall be responsible for the management, control and administration of the Agreement.").

[33] *See, e.g.,* Doc. 15 at 12–13 ("As a fiduciary, the Plan could not raise state law claims because they would be preempted and do not otherwise qualify as equitable relief."); *see also* Doc. 15 at 13 ("Finally, even if this Court found that GSB could qualify under section 1132(a)(3), these recoupment claims should not be considered equitable relief.").

[34] Doc. 18 at 13.

[35] *See, e.g., U.S. Dep't of Labor v. Los Cocos Mexican Rest., Inc.*, No. 22-1004-JWB, 2022 WL 16571180, at *5 (D. Kan. Nov. 1, 2022) ("Recoupment is an equitable defense, not a legal claim for money damages or an equitable cause of action." (citing *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 240 (5th Cir. 2019))); *see also Ute Indian Tribe of the Unitah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1011 (10th Cir. 2015) ("And even assuming the doctrine might operate in cases like this, 'recoupment is in the nature of a defense' to defeat a plaintiff's claims, not a vehicle for pursuing an affirmative judgment." (quoting *Bull v. United States*, 295 U.S. 247, 262 (1935))).

2.    **Conflict Preemption**

To determine whether a claim is subject to conflict preemption, "[a] court must analyze whether statutory or common law actions asserted . . . 'relate to' an employee benefit plan and therefore fall under ERISA's express pre-emption clause."[36]  "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."[37]  The Supreme Court has interpreted this clause narrowly, holding that ERISA conflict preemption will preempt only those state laws that have a reference to ERISA plans or have an impermissible connection with an ERISA plan.[38]  A state law will "reference" ERISA plans where it "acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation."[39]  As for determining whether a state law has an impermissible "connection" with an ERISA plan, the Supreme Court has found such a connection where "'acute, albeit indirect, economic effects' of the state law[s] 'force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers.'"[40]  Therefore, conflict preemption does not apply "'if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability.'"[41]

---

[36] *Cannon v. Grp. Health Serv. of Okla., Inc.*, 77 F.3d 1270, 1273 (10th Cir. 1996) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)).

[37] *Shaw v. Delta Air Lines*, 463 U.S. 85, 96–97 (1983).

[38] *Cal. Div. of Lab. Standards Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997).

[39] *Id.*

[40] *Gobeille v. Liberty Mutual Ins. Co.*, 577 U.S. 312, 320 (2016) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995)).

[41] *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1154 (10th Cir. 2004) (quoting *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.1 (1992)).

Here, Defendants bring their counterclaims under the Kansas common law doctrine of recoupment.  The doctrine of recoupment:

> Allows a defendant to "defend" against a claim by asserting, up to the amount of the claim, the defendant's own claim against the plaintiff growing out of the same transaction, or set of transactions, strictly for the purpose of abatement or reduction of the plaintiff's claim.  It encompasses the right of a defendant to reduce or eliminate the plaintiff's demand either because the plaintiff has not complied with some cross obligation under the contract on which the plaintiff sues or the plaintiff has violated some legal duty in making or performing that contract.[42]

As the common law doctrine of recoupment does not directly refer to ERISA plans or differentiate between its application to ERISA and non-ERISA plans, it does not "relate to" ERISA plans such that Defendants' counterclaims are preempted.[43]  Rather, the common law doctrine of recoupment applies generally to contract disputes of any kind.  Similarly, the Court finds that the common law doctrine of recoupment does not have an impermissible "connection with" ERISA plans—in fact, the Court sees no specific connection between the common law doctrine of recoupment and an ERISA plan.

For these reasons, the Court finds that Defendants' counterclaims are neither completely nor conflict preempted, and therefore denies Plaintiff's motion to dismiss.

### B.    Stay Pending Resolution of State Court Civil Action

In the alternative to dismissal for preemption under ERISA, Plaintiff asks this Court to stay Defendants' counterclaims pending resolution of a related state court action which Plaintiff

---

[42] *City of Hays v. Big Creek Improvement Dist.*, No. 88-262, 2003 WL 27393457, at *3 (Kan. Ct. App. May 2, 2003) (quoting 80 C.J.S., Set-Off and Counterclaim § 2).

[43] *See Dillingham*, 519 U.S. at 325 (declining to find a reference to ERISA plans where the regulated programs could be but "need not necessarily be" ERISA plans); *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S.Ct. 474, 481 (2020) (finding that a state law did not "refer to" ERISA when it affected ERISA plans "only insofar as [pharmacy benefit managers] may pass along higher pharmacy rates to plans with which they contract").

claims will resolve issues that overlap with those counterclaims.  For the reasons set forth below, the Court denies this request.

On June 8, 2022, Feiling filed a civil action in the District Court of Logan County, Kansas, against a number of defendants including the Bank, Plaintiff, Draper, and other employees of the Bank.[44]  Against the Bank, Plaintiff, and the other employees of the Bank, Feiling asserted claims of fraud, negligence, and breach of fiduciary duty.[45]  Plaintiff claims that Feiling's state court case will resolve issues that overlap with Defendants' counterclaims, including issues regarding: (1) Nix and Feiling's missing cattle; (2) what the Bank and Plaintiff knew and who is culpable; (3) Plaintiff's employment, including all five of the incidents described in Defendants' counterclaims; (4) who is to blame for the cattle as between the Bank, Plaintiff, Draper, and others; (5) whether anyone committed fraud; (6) whether anyone was negligent; and (7) whether anyone breached a fiduciary duty.  Because of this overlap, Plaintiff urges the Court to stay determination of Defendants' counterclaims—but continue with Plaintiff's lawsuit—asserting that "[w]hether Defendants violated ERISA is not being considered in the state court and can be determined by this Court while the other action proceeds."[46]

Plaintiff's argument for a stay of Defendants' counterclaims is based on the *Colorado River* doctrine, which establishes certain factors for a district court to consider when deciding whether to dismiss or stay a federal suit that parallels a state court proceeding.[47]  To determine whether a stay under *Colorado River* is warranted, the Court must first determine whether the

---

[44] *See Feiling v. Guaranty State Bank & Trust Co.,* Case No. 22-cv-000010 (Logan Cnty. Dist. Ct. 2022).

[45] *See* Doc. 14-2 at 14–16.

[46] Doc. 15 at 15.

[47] *See Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999).

two actions are parallel, before then turning to the six *Colorado River* factors.[48]  As explained

further below, the Court finds that the two actions here are not parallel.  Therefore, the Court

need not proceed to consider the *Colorado River* factors.[49]

 Lawsuits are considered parallel "if substantially the same parties litigate substantially

the same issues in different forums."[50]  In determining whether state and federal proceedings are

parallel, the Tenth Circuit has instructed district courts "to examine the state proceedings as they

actually exist," as opposed to examining how the state proceedings "could have been brought in

theory."[51]  The Tenth Circuit prefers this approach because in order to stay a case based on the

*Colorado River* doctrine, the state court litigation must be an "adequate vehicle for the complete

and prompt resolution of the issue between the parties."[52]  If the *Colorado River* doctrine is

properly invoked, the federal court should "have nothing further to do in resolving any

substantive part of the case."[53]

 Here, while both the Bank and Plaintiff are parties to the state court action, the Board is

not.  Moreover, while it is true, as Plaintiff points out, that the issues to be resolved in the state

court action substantially overlap with Defendants' counterclaims, they do not overlap with

Plaintiffs' claims against Defendants.  Plaintiff all but concedes this point, asserting that his

ERISA claims against Defendants can proceed independently of the state court action.

Therefore, what Plaintiff is requesting amounts to a partial stay; yet Plaintiff has not cited, and

---

[48] *See Allen v. Bd. of Educ., Unified Sch. Dist. No. 435*, 68 F.3d 401, 402 (10th Cir. 1995).

[49] *See, e.g., Chesapeake Operating, L.L.C. v. C.C. Forbes, LLC*, No. 5:20-cv-557-R, 2020 WL 6827798, at *2 (W.D. Okla. Nov. 20, 2020) (concluding that state and federal actions were not parallel and, therefore, that analyzing the *Colorado River* factors was not required).

[50] *Allen*, 68 F.3d at 402 (quoting *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994)).

[51] *Fox*, 16 F.3d at 1080 (citations omitted).

[52] *Id.* (quoting *Moses H. Core Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)).

[53] *Id.* at 1081–82 (quoting *Moses H. Core*, 460 U.S. at 28).

the Court has not found, "any authority that a federal district court can partially dismiss or stay a case under *Colorado River*, and it is not clear that *Colorado River* applies when only part of the case is parallel to a state court action."[54]

In the *Colorado River* case, "the Supreme Court stated that the key principles supporting abstention or dismissal of a parallel case are 'conservation of judicial resources and comprehensive disposition of litigation.'"[55] Neither of these goals are promoted by staying Defendants' counterclaims here. Even if the Court were to stay Defendants' counterclaims, this case and the state court action would both remain pending, conserving no judicial resources. Moreover, a ruling by the state court will not provide a comprehensive disposition of the litigation before this Court, as, again, Plaintiff's claims against Defendants will remain.[56] For these reasons, the Court denies Plaintiff's request to stay Defendants' counterclaims pending the outcome of the state court action.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion to Dismiss for Failure to State a Claim or in the Alternative a Motion to Stay Consideration of Defendants' Counterclaims Pending Resolution of a Parallel State Court Proceeding (Doc. 14) is **denied**.

**IT IS SO ORDERED.**

Dated: August 15, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[54] *Phoenix Energy Mktg., Inc. v. Chase Oil Corp.*, Case No. 16-cv-0681, 2017 WL 6397492, at *4 (N.D. Okla. Dec. 14, 2017).

[55] *Id.* (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

[56] *See, e.g., Shadwick v. Butler Nat'l Corp.*, 950 F. Supp. 302, 305 (D. Kan. 1996) ("Here, there is almost no chance that the state action will resolve plaintiff's claims, a major portion of the instant action. In these circumstances, a stay does not promote, and likely will be contrary to, the goal of avoiding piecemeal litigation.").