**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **DAVID CRAWFORD,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 22-2542-JAR-GEB** |
| **THE GUARANTY STATE BANK & TRUST COMPANY et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff David Crawford brings this lawsuit against his former employer, The Guaranty State Bank & Trust Company ("the Bank"), and The Executive Salary Continuation Plan for the Bank through its Board of Directors ("the Board") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"),[1] seeking to recover supplemental retirement income under an employee benefit plan.[2] Seventeen months after Plaintiff voluntarily resigned from the Bank, he was notified that his retirement benefits under the Executive Salary Continuation Agreement for The Guaranty State Bank & Trust Company ("the Plan" or "ESCA") were being terminated. Defendants claim the Board terminated Plaintiff's benefits under the Plan because they discovered evidence that Plaintiff engaged in self-dealing, breaches of the duty of loyalty to the Bank, and breaches of the Bank's trust at the time he resigned. Plaintiff challenges the termination of benefits decision on several grounds.

---

[1] 29 U.S.C. § 1001 *et seq.*

[2] Doc. 1. Defendants assert five counterclaims against Plaintiff for recoupment on the basis of fraudulent misrepresentation and omission, conversion, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and negligence under Kansas law. Doc. 11. The counterclaims are not at issue on these motions.

This matter is before the Court on Defendants' Motion for Judgment on Plaintiff's ERISA Claim (Doc. 42); Plaintiff's Motion for Summary Judgment (Doc. 44) on his ERISA claim; and Defendants' Motion to Strike Extra-Record Evidence (Doc. 64).  The motions are fully briefed, and the Court is prepared to rule.  As described more fully below, the Court grants in part and denies in part Defendants' motion to strike, denies Defendants' motion for summary judgment, and grants Plaintiff's motion for summary judgment.  The Court remands this matter to the plan administrator.

## I.     Standard of Review

### A.     Summary Judgment

Plaintiff's ERISA claim arises under 29 U.S.C. § 1132(a), which allows a beneficiary to bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[3]  As a threshold matter, the parties dispute the proper procedural mechanism for dispositive motions on this claim.  Plaintiff filed a summary judgment motion that includes a lengthy statement of uncontroverted facts.  Defendants move for "judgment" and argue that summary judgment is inapplicable because, under ERISA review standards, the Court must apply a different standard of review that conflicts with Fed. R. Civ. P. 56(a).  The Court follows Tenth Circuit guidance that summary judgment in an ERISA case is "merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the nonmoving party is not entitled to the usual inferences in its favor."[4]

---

[3] 29 U.S.C. § 1132(a)(1)(B).

[4] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1217 (10th Cir. 2023) (quoting *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1221 (10th Cir. 2021)).

### B.      ERISA Review Standards

This Court reviews denial of ERISA benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[5] "'Where the plan gives the administrator discretionary authority,' and 'procedural irregularities' did not infect the administrator's decision," the Court applies "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[6] Under this standard, the court reviews the administrator's decision for abuse of discretion.[7]

Defendants maintain that the arbitrary-and-capricious standard applies here because the ESCA gives the Board discretion to determine Plaintiff's eligibility for benefits: "This Agreement shall be interpreted and administered by the Board in good faith but in its sole discretion. The Board's decisions, unless arbitrary and capricious, shall be entitled to deference."[8] Plaintiff concedes that the Plan gives the Board discretion to make eligibility determinations, but asserts that the *de novo* standard nonetheless applies because the Board had a conflict of interest, and because there were procedural irregularities during the claims process. The Court addresses each assertion in turn.

### 1.      Conflict of Interest

First, Plaintiff argues that the Board had a conflict of interest that requires this Court to conduct a *de novo* review of the record. In *Metropolitan Life Insurance Co. v. Glenn*, the

---

[5] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[6] *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1294 (10th Cir. 2023) (alteration omitted) (quoting *LaAsmar*, 605 F.3d at 796).

[7] *See Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012).

[8] Doc. 74 at 147.

Supreme Court considered the appropriate standard of review where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest."[9]  *Glenn* makes clear that a conflict of interest does not change the standard "from deferential to *de novo* review."[10]  Instead, the deferential standard of review continues to apply and the conflict is "one factor among many that a reviewing judge must take into account."[11]  Thus, the Court declines to apply a *de novo* review standard based on the Board's alleged conflict of interest.

### 2.    Procedural Irregularities

Next, Plaintiff argues that procedural irregularities during the claim process trigger *de novo* review.  Specifically, Plaintiff argues that the Board failed to comply with ERISA's procedural regulations in denying his claim by not sufficiently specifying the evidence upon which it relied in making its termination of benefits decision, and by not providing Plaintiff with all of the documents the Board relied on during the claim review process.[12]

Plaintiff is correct that the Tenth Circuit has applied *de novo* review "notwithstanding the fact that the Plan afforded the administrator discretion to make benefits determinations, where there were procedural irregularities in the administrator's consideration of the benefits claim."[13]  But these Tenth Circuit decisions involve cases where a plan administrator failed to comply with the time limits for issuing decisions under ERISA.[14]  Cases addressing the failure of plan

---

[9] 554 U.S. 105, 111 (2008) (emphasis omitted) (quoting *Firestone*, 489 U.S. at 115).

[10] *Id.* at 115.

[11] *Id.* at 116.

[12] *See* 29 C.F.R. § 2560.503-1(g)(i)–(iv), (h)(2).

[13] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 797 (10th Cir. 2010).

[14] *See, e.g.*, *id.* at 796–97 (applying *de novo* review due to plan administrator's failure to comply with ERISA's time limits); *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315–16 (10th Cir. 2009) (same); *Thompson v. Union Sec. Ins. Co.*, 688 F. Supp. 2d 1257, 1263–64 (D. Kan. 2010) (same); *see also Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1066 (10th Cir. 2020) (holding that *de novo* review was required because the plan administrator failed to give members notice of the existence of document with information about its

administrators to provide full and fair explanations for their denials apply the arbitrary-and-capricious standard of review, and address whether the plan administrator's failure to provide sufficient notice of the reasons for denial, or the evidence upon which it relied, meets that standard.[15]  The Court therefore considers Plaintiff's arguments about Defendants' compliance with the ERISA regulations governing claims procedure on the merits under the arbitrary-and-capricious standard.

### 3.    Arbitrary and Capricious Review

For the reasons stated above, the Court applies an arbitrary-and-capricious standard of review, but considers any conflict of interest and procedural irregularity as part of that analysis. The Tenth Circuit "treats the abuse-of-discretion standard and the arbitrary-and-capricious standard as 'interchangeable in this context,' and 'applies an arbitrary and capricious standard to a plan administrator's actions.'"[16]  The plan administrator's decision will be upheld "so long as it was made on a reasoned basis and supported by substantial evidence."[17]

Reasonableness review under this standard "considers if [the decision] (1) 'was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan

---

discretionary authority under the plan); *Easter v. Hartford Life & Accident Ins. Co.*, No. 21-4106, 2023 WL 3994383, at *5 (10th Cir. June 14, 2023) ("While Hartford is correct that we have never extended the procedural-irregularity exception beyond two limited scenarios—*viz.*, where a claim administrator either did not issue a decision or issued a substantially late appeal decision—we need not decide whether the exception could extend to other scenarios.").

[15] *See, e.g.*, *D.K. v. United Behav. Health*, 67 F.4th 1224, 1235–44 (10th Cir. 2023) (finding that the plan administrator "acted arbitrarily and capriciously in not providing analysis or citations to the medical record in its denial letters."), *cert. denied*, 144 S. Ct. 808 (2024); *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1309–13 (10th Cir. 2023) (considering procedural irregularities, including failure to fully explain its decision, in finding that plan administrator's decision was arbitrary and capricious); *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1295 (10th Cir. 2023) (considering whether denial letters provided a reasoned explanation for the decision under an arbitrary-and-capricious standard of review).

[16] *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231–32 (10th Cir. 2012) (quoting *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 & n.2 (10th Cir. 2004) (per curiam), *abrogated on other grounds by Glenn*, 544 U.S. at 118).

[17] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1219 (10th Cir. 2023) (quoting *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018)).

administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.'"[18]  "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one."[19]  Rather, courts ask only "whether the administrator's decision resides 'somewhere on a continuum of reasonableness—even if on the low end.'"[20]  "Consequently, the Tenth Circuit has observed that the arbitrary and capricious standard 'is a difficult one for a claimant to overcome.'"[21]

The Court also considers whether there is substantial evidence to support the decision.[22] "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker.'  And as [the Court] consider[s] 'whether the evidence in support of the administrator's decision is substantial, [it] must take into account whatever in the record fairly detracts from its weight.'"[23]

## II.     Background

### A.     Defendants' Motion to Strike

Before the Court can recite the facts upon which it reviews the Board's decision, it must consider Defendants' motion to strike the following exhibits Plaintiff submitted in support of his motion for summary judgment:

Exhibit 1 (Doc. 44-1)—Declaration of Benjamin Tompkins

---

[18] *D.K.*, 67 F.4th at 1236 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co*., 491 F.3d 1180, 1193 (10th Cir. 2007), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105, 111 (2008)).

[19] *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006) (citations omitted).

[20] *Id.* (quoting *Kimber v. Thiokol Corp*., 196 F.3d 1092, 1098 (10th Cir. 1999)).

[21] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1174 (D. Kan. 2010) (quoting *Nance v. Sun Life Assurance Co. of Can.,* 294 F.3d 1263, 1269 (10th Cir. 2002)).

[22] *Adamson*, 455 F.3d at 1212 (citation omitted).

[23] *Ian C. v. UnitedHealthcare Ins. Co*., 87 F.4th 1207, 1219 (10th Cir. 2023) (first quoting *Sandoval v. Aetna Life & Cas. Ins. Co*., 967 F.2d 377, 382 (10th Cir. 1992); and then quoting *Graham v. Hartford Life & Accident Ins. Co*., 589 F.3d 1345, 1358 (10th Cir. 2009)).

Exhibit 1.J (Doc. 44-11)—Guaranty's 2022 Code of Conduct

Exhibit 2 (Doc. 44-17)—Defendants' Privilege Log

Exhibit 3 (Doc. 44-18)—Dismissal Documents

Exhibit 4 (Doc. 44-19)—Charges and Judgment against Draper

Exhibits 5 and 6 (Docs. 44-20 and 44-21)—Excerpted Discovery Responses

Doc. 44-23—Declaration of Plaintiff[24]

The law is clear that "in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record."[25]  A claimant cannot supplement the record on the issue of eligibility for benefits.[26]  However, "this general restriction does not conclusively prohibit a district court from considering extra-record materials related to an administrator's dual role conflict of interest."[27]  Procedural irregularities might also permit record supplementation.[28]

---

[24] Plaintiff did not include his declaration in his exhibit list or separately label it.

[25] *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1157 (10th Cir. 2010) (quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008)).  Even if the Court's review was *de novo*, it would be limited to the administrative record unless Plaintiff could meet the four-part test set forth in *Hall v. UNUM Life Insurance Co. of America*, 300 F.3d 1197, 1203 (10th Cir. 2002).  Under that test:

> (1) the evidence must be "necessary to the district court's de novo review;" (2) the party offering the extra-record evidence must "demonstrate that it could not have been submitted to the plan administrator at the time the challenged decision was made;" (3) the evidence must not be "[c]umulative or repetitive;" nor (4) may it be "evidence that 'is simply better evidence than the claimant mustered for the claim review.'"

*Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1309 (10th Cir. 2007) (alteration in original) (quoting *Hall*, 300 F.3d at 1203).  Plaintiff argues in response to the motion to strike that *de novo* review applies, thus, "the Court may properly consider these materials."  Doc. 70 at 7.  But Plaintiff wholly fails to acknowledge the *Hall* factors, much less meet his burden of establishing them for each piece of evidence he submits outside of the administrative record.

[26] *Murphy*, 619 F.3d at 1158–59, 1162 (citations omitted).

[27] *Id.* at 1162.

[28] *Nelson v. Aetna Life Ins. Co.*, 568 F. App'x 615, 619 (10th Cir. 2014) (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972–73 (9th Cir. 2006)).

Defendants served Plaintiff with the administrative record and a Joint Phase 1 Privilege and Redaction Log on July 26, 2023.[29]  The parties also engaged in limited ERISA and conflict-of-interest discovery.  When Plaintiff filed his motion for summary judgment, he attached the administrative record as Exhibit 1.  He also attached counsel Benjamin Tompkins' declaration, which explains that Exhibit 1 is "the administrative record from Defendants" he received via e-mail on or about July 26, 2023.[30]

Tompkins' declaration also sets forth the parties' communications about the completeness of the administrative record—he maintains that certain documents were missing that should have been included.  According to Tompkins, the parties obtained an extension of the Phase I Scheduling Order deadlines to finish their discovery.  Plaintiff neither filed a motion to compel, nor a motion to challenge the completeness of the administrative record produced, nor a motion to supplement the record prior to filing his dispositive motion.

Plaintiff opposes the motion to strike for several reasons that the Court discusses below. To aid in the Court's consideration of these issues, it ordered Defendants to separately file the administrative record it produced to Plaintiff in this case during discovery.  The Court's citations to the administrative record are to this docket entry.[31]

### 1.      Whether Fed. R. Civ. P. 12(f) Applies

Plaintiff initially argues that a motion to strike is an inappropriate way to decide the scope of evidence to be reviewed on these cross-motions because Rule 12(f) only applies to pleadings.  The Court declines to engage with Plaintiff's arguments on this issue.  As stated

---

[29] Doc. 30.

[30] Doc. 44-1 ¶ 3.  Exhibit 7 includes documents Tompkins claims were missing from the administrative record produced by Defendants.  Doc. 44-22.  Defendants do not move to strike this exhibit.

[31] Doc. 74.

above, the typical summary judgment practice of presenting statements of uncontroverted facts outside of a designated administrative record and sometimes limited discovery, with inferences made in favor of the nonmoving party, is inapplicable to the Court's review in ERISA cases. Moreover, it is the proponent of outside evidence that should file a motion to supplement if it requests the Court consider evidence outside the administrative record.[32]  Nonetheless, Plaintiff failed to file a motion to supplement along with his summary judgment motion.  It should not be surprising that Defendants would litigate this issue.  Defendants' motion to strike fairly puts before the Court whether Plaintiff has made the requisite showing that the administrative record should be supplemented, despite his failure to follow the proper protocol.

2.      **Completeness of the Administrative Record Submitted by Defendants**

Defendants' motion to strike argues that Plaintiff improperly submitted evidence outside the administrative record with his motion for summary judgment.  Plaintiff first responds that Defendants did not produce a complete administrative record, so several documents he submitted on summary judgment are properly before the Court because they were submitted to the Board before it made its final decision to terminate his retirement benefits under the Plan.  He further argues that he was entitled to receive the documents listed on Defendants' privilege log, which was produced to him at the time Defendants produced the administrative record.  Defendants maintain that they submitted a complete administrative record, and that they properly withheld documents covered by the attorney-client privilege and the work product doctrine.

---

[32] *See Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010) (citation omitted).

9

### a.     Scope of Administrative Record

The Tenth Circuit describes the "administrative record" in an ERISA case as "the materials compiled by the administrator in the course of making his decision."[33]  This includes materials submitted to the plan administrator before it issued its final denial, and that the plan administrator considered in evaluating the claimant's appeal.[34]  In considering the scope of the administrative record in this case, the Court is mindful that ERISA regulations provide that a document is "relevant" to a claim if it:

> (i) Was relied upon in making the benefit determination;
>
> (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; [or]
>
> (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination . . . .[35]

The Court denies Defendants' motion to strike Exhibit 11, which is the Bank's 2022 Code of Conduct.  This document is included in the administrative record; therefore, the Court may consider it.[36]  The Court also denies Defendants' motion to strike Exhibit 1, the Tompkins Declaration, and considers it for the limited purpose of determining whether certain documents

---

[33] *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002) (citations omitted).

[34] *See Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citing *Kalish v. Liberty Life Assurance Co.*, 419 F.3d 501, 511 (6th Cir. 2005)), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105, 111 (2008); *see also Helton v. AT & T Inc.*, 709 F.3d 343, 353 (4th Cir. 2013) ("Not surprisingly, then, [the plan administrator] cannot cite, nor have we found, any case in which we have held that a district court could not consider evidence from outside of the administrative record when that evidence was known to the administrator at the time the administrator rendered its benefits determination.").

[35] 29 C.F.R. § 2560.503-1(m)(8).

[36] Doc. 74 at 125–29.

were received by Plaintiff as part of the discovery in this case, and whether Plaintiff submitted certain documents to the Board during the benefit determination process.

Plaintiff argues that Exhibit 3, an email from Tompkins to Tuck attaching the dismissal of criminal charges against Plaintiff, was provided to the Board's attorney during the claim review process. Tompkins has personal knowledge that this information was provided to the Board, and submits his email sending the document to Tuck while the appeal was ongoing. The Court agrees that this document may be considered along with the administrative record because it was provided to the Board during the claim review process, and therefore denies the motion to strike Exhibit 3.

Exhibit 4 is a copy of exhibits the Bank filed in response to a different lawsuit brought by Mark Feiling. Plaintiff argues it should be considered by the Court because the Bank was aware of these documents during the benefit determination period, and because they go to whether the Bank had a conflict of interest. They include Chad Draper's criminal complaint filed in Logan County on December 31, 2020, and the Draper criminal judgment entered on May 19, 2022.[37] Tompkins pointed to the Draper charges in his February 18, 2022 letter to Tuck, which is part of the administrative record. The Court will therefore consider them, and denies Defendants' motion to strike Exhibit 4.

### b.    Documents Withheld as Privileged or Work Product

The parties dispute whether the Board properly withheld from Plaintiff the documents listed on its privilege log under the attorney-client privilege and work-product doctrine. The privilege log lists several documents dated between September 14, 2021 and October 20, 2022, which the Board either redacted or withheld on the basis of attorney-client privilege and the

---

[37] Doc. 44-19.

work product doctrine.[38]  One document, dated October 20, 2022, was redacted on the additional basis that it contains confidential customer and bank information.

Plaintiff claims that the fiduciary exception to the attorney-client privilege applies here, so the unredacted documents listed on the privilege log should have been produced to him. Defendants respond that because the ESCA is a "top hat plan," it is exempt from ERISA's fiduciary requirements and, therefore, the fiduciary exception to the attorney-client privilege does not apply.

"A 'top hat' plan is a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."[39]  Thus,

> a top hat plan "must" "be unfunded and exhibit the required purpose" and "must also cover a 'select group' of employees." Whether the group of employees is "select" is determined by looking both qualitatively and quantitatively. . . .  "In number, the plan must cover relatively few employees.  In character, the plan must cover only high level employees."[40]

The Sixth Circuit has explained:

> While "top hat" plans are governed by ERISA, they are not subject to many of the substantive standards required of other retirement plans, such as participation, vesting, accrual, funding, fiduciary responsibility, disclosure, and reporting.  These exceptions are made in recognition of the ability of high level employees to influence or negotiate elements of their compensation packages,

---

[38] Doc. 44-17.

[39] *Kramer v. Am. Elec. Power Exec. Severance Plan*, No. 21-CV-5501, 2023 WL 2925117, at *2 (S.D. Ohio Apr. 13, 2023) (quoting 29 U.S.C. § 1051(2)), *aff'd*, No. 2:21-CV-5501, 2023 WL 5177429 (S.D. Ohio Aug. 11, 2023).

[40] *Bond v. Marriott Int'l, Inc.*, 637 F. App'x 726, 729 (4th Cir. 2016) (first quoting *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996); then quoting *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 288 (2d Cir. 2000); and then quoting *In re New Valley Corp.*, 89 F.3d at 148); *see also Browe v. CTC Corp.*, 15 F.4th 175, 194–95 (2d Cir. 2021); *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1192–93 (9th Cir. 2007).

eliminating the need for protections afforded other employees under ERISA.[41]

The Third Circuit has observed that "top hat plans form a rare sub-species of ERISA plans, and Congress created a special regime to cover them."[42]

The ESCA meets the criteria for top hat plans with one glaring exception. By its terms, it is unfunded,[43] and was maintained by the Bank as a fringe benefit that applies to a single employee—Plaintiff, i.e. "the Executive."[44] Therefore, the Plan covers a "select" group of employees both quantitatively and qualitatively. The Plan makes clear that it was executed as part of the Bank's intention to retain Plaintiff's services in exchange for supplemental retirement benefits under certain conditions. And the terms of the ESCA state that "[t]he Executive is fully advised of the Bank's financial status and has had substantial input in the design and operation of this arrangement."[45]

Yet, the ESCA did not just designate the Board as having discretionary authority, it also explicitly designated the Board as an ERISA fiduciary.[46] Given this explicit provision, the Court

---

[41] *Tate v. Gen. Motors LLC*, 538 F. App'x 599, 602–03 (6th Cir. 2013) (first citing *Simpson v. Mead Corp.*, 187 F. App'x 481, 483–84 (6th Cir. 2006); and then citing *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007)).

[42] *In re New Valley Corp.*, 89 F.3d at 148.

[43] This means it is "'payable from the general assets' of the employer as opposed to a plan payable from 'a *res* separate from the ordinary assets of the corporation.'" *Deal v. Kegler Brown Hill & Ritter Co.*, 551 F. Supp. 2d 694, 699 (S.D. Ohio 2008) (quoting *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 932 (3d Cir. 1985), *overruled on other grounds by Pritzker v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993)).

[44] Doc. 74 at 140.

[45] *Id.*; *see Sikora v. UPMC*, 876 F.3d 110, 115–16 (3d Cir. 2017) (collecting cases explaining that although there is no bargaining-power requirement under ERISA's definition of a top hat plan, some circuit courts have relied on evidence that a participant exerted influence during the plan's bargaining process as evidence in support of a top hat plan).

[46] *Cf. Koeplin v. Klotz*, 265 F. Supp. 3d 1039, 1043–44 (N.D. Cal. 2017) (rejecting argument that because the plan administrator exercised discretionary authority over the top hat plan, he satisfied ERISA's definition of a fiduciary under 29 U.S.C. § 1002(21)(A)).

cannot find that the Plan is exempt from ERISA's fiduciary responsibility provisions, including the fiduciary exception to the attorney-client privilege.[47]

Defendants argue that even if the fiduciary exception to the attorney-client privilege applies to these documents, they were properly withheld as attorney work product because they were generated in anticipation of litigation.  "The work-product doctrine protects from discovery those documents, things and mental impressions of a party or its representative, particularly its attorney, developed in anticipation of litigation."[48]  Unlike the attorney-client privilege, "the weight of authority . . . has found that the fiduciary exception does not apply to the work-product doctrine."[49]  This is because "once there is sufficient anticipation of litigation to trigger the work product immunity, the mutuality between a trustee and a beneficiary is destroyed."[50]

Thus, when Plaintiff hired separate counsel to represent him in anticipation of litigation with the Bank and the Board, "it makes no sense to require [Defendants' counsel] to disclose its work product concerning the central issue in the litigation—the construction of the . . .

---

[47] *See* 29 U.S.C. § 1101(a)(1) (stating that ERISA's Part 4 provisions on fiduciary responsibility "shall apply to any employee benefit plan described in section 1003(a) of this title (and not exempted under section 1003(b) of this title), other than . . . a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."); *see also Kramer v. Am. Elec. Power Exec. Severance Plan*, No. 2:21-CV-5501, 2023 WL 2925117, at *2 (S.D. Ohio Apr. 13, 2023) ("'[A] fiduciary of an ERISA plan must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan.' . . . But where there are no fiduciary duties, attorney-client privilege stays intact." (quoting *Moss v. Unum Life Ins. Co.*, 495 F. App'x 583, 595 (6th Cir. 2012))), *aff'd*, No. 2:21-CV-5501, 2023 WL 5177429 (S.D. Ohio Aug. 11, 2023).

[48] *Kannaday v. Ball*, 292 F.R.D. 640, 648 (D. Kan. 2013) (citation omitted).

[49] *Murphy v. Gorman*, 271 F.R.D. 296, 321 (D.N.M. 2010) (collecting cases); *see also Herrmann v. Rain Link, Inc.*, No. 11-1123-RDR, 2012 WL 1207232, at *6 (D. Kan. Apr. 11, 2012) ("[C]ourts have generally found the fiduciary exception inapplicable to communications made during a time when the parties' interests were not aligned or when the subject of the communications did not involve matters that a fiduciary would owe a duty to disclose to a beneficiary.").

[50] *Gorman*, 271 F.R.D. at 321 (first citing *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1239 (5th Cir. 1982); and then citing *Jicarilla Apache Nation v. United States*, 88 Fed. Cl. 1, 13 (2009)).

Agreement and the conclusions, opinions, or legal theories that [the Defendants' counsel] has developed about the . . . Agreement."[51]

On October 22, 2021, Tompkins sent Tuck, the Board's outside counsel, a letter in response to the Bank's September 28, 2021 letter giving Plaintiff notice of the Board's decision to terminate his benefits under the ESCA.[52]  In that letter, Tompkins objected to the decision to terminate Plaintiff's retirement benefits.  He stated that "[w]hile we prefer to amicably resolve this dispute with a clearly warranted reversal by GSB of its indefensible position, we are prepared to bring suit and defend the retirement benefits that Mr. Crawford spent his entire working life earning."[53]  Plaintiff wholly fails to address Defendants' claim that the documents on the privilege log are protected not only by the attorney-client privilege, but also by the work-product doctrine.  The Court therefore finds that even if the fiduciary exception to the privilege applies, documents on the privilege log generated after October 22, 2021, were prepared in anticipation of litigation and are thus protected work product.[54]

Accordingly, the Court grants Defendants' motion to strike Defendants' privilege and redaction log to the extent Plaintiff argues that it is admissible to show that Defendants inappropriately withheld documents from the administrative record to which he was entitled.  The Court considered the privilege log for the limited purpose of deciding whether Defendants properly invoked the attorney-client privilege and work-product immunity for the documents

---

[51] *Id.* (citation omitted).

[52] Doc. 74 at 28–32.

[53] *Id.* at 32.  Earlier in the letter, Tompkins repeatedly threatened "legal action against GSB and its individual directors to defend his duly earned retirement benefits" if the decision is not reversed, including a request for punitive damages.  *Id.* at 29, 31.

[54] Only one entry on the log fails to meet this criteria—a September 14, 2021 document described as "Cover letter forwarding termination letter for review of Board, as well as discussing legal status of Crawford investigation and termination."  Doc. 44-17 at 2.

listed therein and concludes that the documents generated prior to October 22, 2021, are protected work product.

### 3.      Discovery Responses

Defendants move to strike Exhibits 5 and 6 to Plaintiff's summary judgment motion, which are Defendants' discovery responses in this case.[55]  As stated above, evidence outside the administrative record may be discoverable and admissible to determine whether a plan administrator had a conflict of interest, and the extent to which any conflict decreases the amount of deference the Court gives to the termination decision.  Defendants offer no independent argument in their motion about why this discovery should be excluded given that it was produced by them as discovery in this case.  Thus, the Court finds that Exhibits 5 and 6 are admissible to the extent they are relevant to the conflict-of-interest question.

### 4.      Plaintiff's Declaration

Finally, Defendants move to strike Plaintiff's declaration in support of his motion for summary judgment.[56]  Plaintiff's declaration, executed on October 24, 2023, is clearly outside the administrative record.  It was not before the Board when it made its initial termination decision, nor was it submitted or generated during the claim review process.  Plaintiff offers his declaration in support of several points in his summary judgment motion.

First, to the extent Plaintiff's declaration is offered to challenge the Board's substantive decision denying him retirement benefits under the ESCA, it must be excluded.  As stated above, there is no exception to the rule that the Court must confine its review to the administrative record for materials on the merits of the termination decision.  Plaintiff also offers statements

---

[55] Docs. 44-20, 44-21.

[56] Doc. 44-23.

about his work history and performance when he was employed by the Bank.  Again, the Court

finds that this is an impermissible attempt to supplement the administrative record; there is no

evidence that this information was considered by the Board when it made its decision to

terminate Plaintiff's retirement benefits under the ESCA, outside of references in Tompkins'

letters in the administrative record.

Second, Plaintiff references and summarizes certain evidence that he was made privy to

during the course of the Kansas Bureau of Investigation's ("KBI") investigation of him.

Specifically, he refers to tape-recorded conversations between KBI agents and Bank employees

that he claims the Board would have been aware of when it made the termination decision.  The

Court excludes these statements.  There is no evidence that they were before the Board when it

made its termination decision other than Plaintiff's speculative and conclusory assertions in this

declaration.  Nor have the underlying recordings been produced in discovery, or submitted with

Plaintiff's declaration.  To the extent these or other communications are described in the letters

to the Board from Plaintiff's attorneys during the appeal process, those letters are part of the

administrative record and will stand for themselves.[57]

Finally, Plaintiff offers statements to support his contention that the Board terminated his

benefits because it would save the Bank shareholders money, which was a financial conflict of

interest.  Defendants object because the underlying information to which Plaintiff refers in his

declaration was not produced by the parties during discovery.  The Court agrees.  Plaintiff sought

information on these topics through limited discovery in this case and attaches those discovery

responses as Exhibits 5 and 6, which is permissible.  However, Defendants objected to many of

---

[57] Similarly, the Court has already determined that the charges and dismissal documents in Plaintiff's criminal case may be considered.  Those documents speak for themselves and the Court need not consider Plaintiff's statement about the contents of those documents.

the requests as overly broad and outside the scope of permissible discovery.  Rather than file a motion to compel and allow the court to rule,[58] Plaintiff opted to file this declaration about his knowledge of the Bank's shareholders in this case without attaching any underlying documentation.

According to Defendants, the information in Plaintiff's declaration was never produced to them during discovery.  The Court agrees with Defendants that this is an improper attempt to put information before the Court that was the subject of a valid discovery objection.  Plaintiff could have moved to supplement the record with the many sources he discusses in his declaration but failed to separately attach.  But Plaintiff failed to litigate Defendants' objections or move to supplement.  The Court declines Plaintiff's invitation to consider documents that are neither part of the administrative record, nor part of the parties' conflict-of-interest discovery.  Accordingly, the Court excludes Plaintiff's declaration.

### 5.    Defendants' Exhibits 7 and 8

Defendants attached two exhibits from outside the administrative record to their motion for judgment—Exhibits 7 and 8.[59]  Exhibit 7 is the 2022 Liability and Expense Summary showing the balance for Plaintiff's benefits under the ESCA.  Exhibit 8 is the Bank's general ledger.  These documents were produced to Plaintiff during discovery and are offered for the limited purpose of rebutting Plaintiff's claim that the Board has a financial conflict of interest.  Plaintiff does not separately move to strike or exclude these documents, but in response to Defendants' motion to strike, Plaintiff maintains that Defendants should not be able to introduce

---

[58] The court would have been required to consider the Tenth Circuit's guidance that "while discovery may, at times, be necessary to allow a claimant to ascertain and argue the seriousness of an administrator's conflict, Rule 26(b), although broad, has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010) (citations omitted).

[59] Docs. 42-7, 50.

these extra-record exhibits and, at the same time, move to exclude him from submitting extra-record evidence in support of his motion.

Plaintiff compares apples and oranges.  Unlike Plaintiff's declaration and the evidence it summarizes rather than attaches, Defendants' exhibits were produced in discovery on the conflict-of-interest issue—discovery propounded by Plaintiff.  Whether Plaintiff's allegations that the Board has a conflict of interest are relevant and supported will be considered on the merits, but the Court finds that Defendants' limited evidence on this issue is proper under *Glenn* and the Tenth Circuit's decision in *Murphy*.[60]  Plaintiff had an equal opportunity to conduct conflict-of-interest discovery and submit it on summary judgment, and an equal opportunity to attach documents produced to him that are relevant to that issue.

### B.    Factual Record[61]

Having determined the appropriate scope of evidence the Court can consider under the arbitrary-and-capricious standard of review in this case, it now proceeds to the facts.  The following undisputed material facts are either part of the administrative record, generated or submitted as part of the Board's review of the termination decision, or properly submitted on the issue of whether the Board had a conflict of interest that impacted its decision.

### *The ESCA*

Plaintiff David Crawford began his employment with the Bank in September 1990 and worked there for approximately 29 years.  On January 25, 2002, Plaintiff and the Bank entered

---

[60] *Murphy*, 619 F.3d at 1157–58 & n.2.

[61] Defendants move to strike Plaintiff's statement of uncontroverted facts, or in the alternative, ask the Court to require him to resubmit a version of his brief that complies with the ERISA standard of review.  The Court declines to grant either form of relief.  As discussed above, the Court confines its review to the administrative record, as supplemented by evidence submitted by Plaintiff that was either before the Board during its review, or that goes to the conflict-of-interest issue.  The Court simply disregards factual statements from the parties that do not meet these standards.

into the ESCA.  Plaintiff is referred to in the agreement as "the Executive."[62]  The ESCA states

that the Board agrees that Plaintiff's services "have been of exceptional merit," and that in an

effort to retain his services, the parties intend to enter into the agreement to "make certain

payments to the Executive at retirement in the event Executive has earned a vested benefit"

under the agreement.[63]  The ESCA further provides:

> [I]t is the intent of the parties that this Agreement be considered an
> unfunded arrangement maintained primarily to provide
> supplemental retirement benefits for the Executive, and be
> considered a non-qualified benefit plan for purposes of the
> Employee Retirement Security Act of 1974, as amended
> ("ERISA").  The Executive is fully advised of the Bank's financial
> status and has had substantial input in the design and operation of
> this arrangement . . . .[64]

The ESCA makes clear that the Bank has "no obligation to set aside, earmark or entrust any fund

or money with which to pay its obligations under this Agreement."[65]  And it "reserves the

absolute right, at its sole discretion, to either fund the obligations undertaken by this Agreement

or to refrain from funding the same and to determine the extent, nature and method of such

funding."[66]

The benefits under the agreement were "granted by the Bank as a fringe benefit . . . and

are not part of any salary reduction plan or an arrangement deferring a bonus or a salary

increase."[67]  In order to fully vest retirement benefits under the ESCA, Plaintiff was required to

---

[62] Doc. 74 at 140.

[63] *Id.*

[64] *Id.*

[65] *Id.* at 143, § VIII.

[66] *Id.*

[67] *Id.* at 141, § II.

remain employed by the Bank through the tenth anniversary of the date of the agreement, which was February 25, 2012, and his employment had to terminate on or after reaching age 65.[68]

However, even if retirement benefits fully vested, the ESCA provides a forfeiture exception:

> Notwithstanding the foregoing, in the event the Executive shall be discharged for cause at any time (or if grounds "for cause" exist at the time the Executive's employment terminates for any reason), all benefits provided herein shall be forfeited.  The term "for cause" shall mean any of the following that may have an adverse effect on the Bank: (i) gross negligence or gross neglect; (ii) the commission of a felony or gross misdemeanor involving moral turpitude, fraud, or dishonesty; (iii) the willful violation of any law, rule, or regulation (other than a traffic violation or similar offense); (iv) an intentional failure to perform stated duties; or (v) a breach of fiduciary duty involving personal profit.[69]

Part VII contains a covenant not to compete.  It applies to Plaintiff while he is employed by the Bank and for a period of twelve months after his employment terminates.

Part X of the ESCA is the ERISA Provision.  It states that the Board is the named fiduciary and plan administrator, and that it

> may delegate to others certain responsibilities under the Agreement including the employment of advisors and the delegation of ministerial duties to qualified individuals.  This Agreement shall be interpreted and administered by the Board in good faith but in its sole discretion.  The Board's decisions, unless arbitrary and capricious, shall be entitled to deference.[70]

Part X(B) provides for a two-part ERISA claims procedure if "a dispute arises over benefits under this Agreement and benefits are not paid to the Executive and such claimant feels he or she is entitled to receive such benefits."[71]

---

[68] *Id.* at 141–42, § V(A), (C).

[69] *Id.* at 142, § V(E).

[70] *Id.* at 146–47, § X(A).

[71] *Id.* at 147, § X(B).

The ESCA was signed by Plaintiff and Douglas R. Johnson, the Bank's President and a member of the Board.

Plaintiff voluntarily resigned from the Bank in April 2020.  He turned 65 years old in November 2021.

On September 23, 2021, the Board held its monthly meeting.  Ten members of the Board attended, including Johnson.  According to the minutes of this meeting, the Board reviewed a "recommendation from Greyson Tuck," and "[t]he attached Johnson Doug & Frasier Curtis Letter 2 – Dave Crawford and Crawford – Notice of Termination of Benefits."[72]  The Board "moved to proceed immediately with a letter to Mr. Crawford," which "carried."[73]

### *Johnson's September 28, 2021 Letter*

On September 28, 2021, Johnson sent Plaintiff a letter referencing the ESCA and a Split Dollar Agreement, a separate agreement he entered into with the Bank.  Johnson's letter provided Plaintiff with notice of the Bank and Board's decision to terminate his benefits under both agreements.  Johnson quoted from Section V(E) of the ESCA, and explained:

> The Bank has recently become aware that, during your tenure as an employee of the Bank, and specifically at the time of termination of your employment, there were multiple events, circumstances and actions you took that constitute:
>
> • Gross negligence or gross neglect;
> • Willful violation of any law, rule or regulation;
> • Intentional failure to perform stated duties; and
> • Breach of fiduciary duties involving personal profits.
>
> These actions as an employee of the Bank, which include, but are not limited to, your actions related to the Bank's extensions of credit to the following Bank borrowers:

---

[72] *Id.* at 160.

[73] *Id.*

> • S&S Investments of Kansas, LLC
> • Greg Koenigsman
> • Ottawa County Feedlot
> • Mark Feiling
> • Mike Nix, and
> • Chad Draper
>
>> collectively and on an individual basis, had an adverse effect on
>> the Bank.  Accordingly, pursuant to and in accordance with
>> Section V(E) of the ESCA, all benefits provided pursuant to the
>> ESCA are automatically forfeited, and the Bank has no liability for
>> any payment to You pursuant to the terms of the ESCA.[74]

The letter proceeded to summarize Section X of the ESCA, and directed Plaintiff to follow the claims review procedure in Section X(B) if he did not agree with "[t]he Bank Board's decision."[75]  The letter also directed Plaintiff to the Bank's attorney, Tuck, if he had "questions, comments or would like to further discuss the contents of this letter."[76]

### The KBI Affidavit

Before sending this letter to Plaintiff, the Board was provided with the probable cause affidavit of Kansas Bureau of Investigation ("KBI") Special Agent Clint Brock, dated September 14, 2021 ("KBI Affidavit").  This seventeen-page affidavit sets forth facts related to the KBI's investigation of approximately 1,600 missing head of cattle from the Draper Cattle Company, a cattle feedlot owned by Chad Draper in Logan County, Kansas.  Plaintiff personally fed his cattle with Draper beginning in 2012; at that time, Draper was a bank customer but Plaintiff was not his loan officer.  On Plaintiff's recommendation, Michael Nix and Mark Feiling, who were both out-of-state Bank customers, began feeding cattle with Draper in 2015 and 2016.  Over a three-year period, cattle were shipped from Nix and Feiling to Draper for feeding, and the cattle were

---

[74] *Id.* at 3–4.

[75] *Id.* at 4.

[76] *Id.* at 5.

primarily inspected by Plaintiff as the assigned loan officer for all three customers.  The Bank inspections were supposed to be used for monitoring the condition of cattle, and for loan continuance and payment information.  Plaintiff was removed as the loan officer on these loans in November 2018.

In late 2018 and early 2019, Draper lost around 700 head of Nix's cattle to death, which was documented by three Bank inspections.  Draper told Nix about the cattle and explained that he was out of money and unable to purchase feed for Nix's remaining cattle at the feedlot.  In March 2019, Nix made arrangements to transfer and sell most of his remaining cattle.

Two Bank employees conducted an onsite inspection of the Draper feed lot on April 2, 2019, and discovered the 1,660 missing head of cattle—960 of Feiling's and 700 of Nix's.  They also learned that Draper sold his farm and feedlot through a "quick sale," and paid his outstanding loan note with the bank.  The Bank employees notified Logan County Sheriff Pat Parsons, who requested assistance from the KBI.

KBI agents interviewed Draper twice, Plaintiff twice, Nix, other Bank employees who conducted inspections or took over the accounts when Plaintiff was removed from them in November 2018, employees of Draper's feedlot, and Kelly Draper, Draper's wife.  Kelly Draper told the KBI that Draper told her he was charging people for feed on cattle that were no longer at his feed yard and was worried about getting in trouble.  Bank employees told the KBI that they were concerned about the accounting methods used to track cattle and generate feed bills.  One Bank employee told the KBI that these practices were unique to Nix and Feiling.

Notably, during a follow-up interview with Draper, he told the KBI that he suspected Plaintiff and Nix had a partnership on the cattle being fed at his feed lot.  He recalled that any conversation with Plaintiff about Nix's or Feiling's cattle was to be on Plaintiff's personal

phone, and not the Bank's.  Draper told the KBI that Plaintiff was aware of the high number of

cattle dying, but that Plaintiff advised him that the numbers would even out, and told him not to

tell anyone from the Bank about the cattle.  Draper also told them that it was Plaintiff's idea in

March 2019 for Draper to sell his property and pay off the Bank, and that Plaintiff told Draper

not to tell anyone about the missing cattle until he sold the property.

The KBI Affidavit also indicates that, even after Plaintiff was removed from working on

the Nix and Feiling loans in late 2018, he continued to maintain contact and perform informal

inspections of their cattle.  Plaintiff told the KBI that he had an arrangement with Nix "in which

he would receive either fifteen or twenty percent of the profit or loss incurred on cattle that Nix

was feeding."[77]  Plaintiff did not deny instructing Draper to sell his property, but told agents that

Johnson was fully aware of his arrangement with Nix.  Nix confirmed that he and Plaintiff had "a

running partnership on cattle.  The terms of the partnership are to share in the profit and loss on

cattle fed in Kansas."[78]  Nix also told the KBI that the partnership was "still active on cattle

currently being fed at Draper's," that Plaintiff was to receive a share of the profit or be

responsible for a share of the loss when cattle at Draper's were finished and sold, and that

Plaintiff had paid him approximately $20,000 so far in cattle losses.[79]

The affidavit concluded:

> Based on the information obtained throughout this investigation,
> Crawford knowingly withheld information from the GSB, Nix and
> Feiling provided to him by Draper that could have prevented the
> aforementioned losses incurred by Feiling and Nix.  Crawford
> withheld this information for personal gain in an attempt to
> eventually recoup losses he would personally face due to the high
> death loss of cattle he was a primary partner in with Nix.

---

[77] *Id.* at 119.

[78] *Id.* at 120.

[79] *Id.*

. . . .

> GSB allowed the engagement of poor accounting principles with little or no accurate method of ensuring the best interest of Nix and Feiling.  The principles set forth in the oversight of the cattle loan agreements allowed for inaccurate inspections and counting, death loss tracking, and feed supply billing that negatively impacted the financial responsibility of Nix and Feiling.  This accounting method, according to Draper, was instituted at the request of Crawford, the acting loan officer for Draper, Nix and Feiling at the time.

> According to GSB records received on Friday, September 11, 2020, Nix has a current outstanding balance of $684,007.72, Feiling has a current outstanding balance of $1,325,876.89.[80]

On the same date that the KBI affidavit was signed, Plaintiff was criminally charged in Logan County, Kansas District Court with two felonies: Impairing a Security Interest in violation of K.S.A. § 21-5830(a)(3), and Making False Information in violation of K.S.A. § 21-5824(a), arising out of the facts set forth in the KBI Affidavit.

Agent Brock also swore an oath for a criminal complaint/information against Draper, which was filed the year before, on December 31, 2020, charging Draper with two counts of theft, one count of impairing a security interest with the intent to defraud the Bank, and one count of making false information.  Draper pled guilty on August 12, 2021, and was sentenced to a term of probation.

### Tompkins' October 22, 2021 Letter

Plaintiff's attorney, Tompkins, sent a letter to Tuck on October 22, 2021, addressing Johnson's letter.  Tompkins informed Tuck that the letter was not "well-taken,"[81] and provided

---

[80] *Id.* at 120–21.

[81] *Id.* at 28.

several reasons why he believed the Bank should reverse its position.  First, Tompkins

challenged the Bank's interpretation of the ESCA's forfeiture provision, arguing that it did not

apply to situations like Plaintiff's where an employee voluntarily resigns, and then the employer

much later claims to have discovered cause existed at the time his employment terminated.

Tompkins argued that the Bank waived its right to terminate benefits under the ESCA by waiting

too long to retract them. And finally, Tompkins argued that Johnson's letter was deficient in

identifying any grounds for cause with specificity.

### *Tuck's December 21, 2021 Response*

Tuck responded to Tompkins' October 22 letter in a six-page letter dated December 21,

2021, providing more detail on the specific grounds for the decision to terminate Plaintiff's

benefits.  Tuck explained that after the Bank learned of the KBI Affidavit and the criminal

charges against Plaintiff, it conducted its own "internal investigation into the facts and

circumstances set forth in the Affidavit," in making its termination decision.[82]  The letter

explained that the Bank learned from the KBI Affidavit and its subsequent internal investigation

that Plaintiff had an undisclosed financial partnership in cattle that was the Bank's collateral on

loans, which violated federal and state banking laws.  The letter also set forth facts upon which

the Bank concluded that Plaintiff took steps to withhold information from the Bank in order to

conceal these activities, including through inspections and accounting methods, and by

instructing Draper not to disclose the cattle deaths to the Bank.

In sum, Tuck explained:

> Mr. Crawford's own admissions and the criminal charges pending
> against him, the KBI Affidavit, and Guaranty's own investigation
> reveal that during the time Mr. Crawford served as the loan officer
> for Nix and Feiling, Mr. Crawford's conduct constituted, at

---

[82] *Id.* at 36.

> minimum, gross negligence in his capacity as a loan officer in the
> oversight of Nix's and Feiling's cattle being fed at Draper's
> feedlot.  This includes, but is not limited to, employing a poor
> accounting method used for Nix's and Feiling's cattle;
> advancements on feed bills for cattle that were dying; failure
> to alert Guaranty to the high death rate of cattle; and inaccurate
> inspections of cattle.  Due to Mr. Crawford's fraudulent conduct
> impairing Guaranty's security interest in collateral and by Mr.
> Crawford having an interest in the proceeds of Nix's loan
> accounts, Mr. Crawford has committed a felony and/or a gross
> misdemeanor involving fraud or dishonesty, and he has willfully
> violated multiple banking laws, regulations, and the policies of
> Guaranty.  These activities all constitute Mr. Crawford's
> intentional failure to perform stated duties, and constitute a breach
> of fiduciary duty involving personal profit.  In summary, Mr.
> Crawford's activities as an employee of Guaranty are such that the
> benefits pursuant to the ESCA have been terminated because all
> five bases of termination "for cause" were satisfied at the time of
> his termination, which is particularly notable considering only one
> basis of a for cause termination must be satisfied to result in
> forfeiture of benefits.[83]

Tuck stated that the Bank was unaware of the facts and circumstances set forth in the KBI Affidavit about Plaintiff's conduct related to Draper, Nix, and Feiling until September 2021. Finally, Tuck advised Tompkins that he should refer to the claims procedure in § X(B) of the ESCA going forward.

### Tompkins' February 18, 2022 Letter—First Claim

Tompkins responded on February 18, 2022, in a 21-page letter to Tuck.  First, he argued that Tuck failed to comply with the ESCA in terminating Plaintiff's benefits because, while Johnson's September letter referenced the Board, Tuck's December letter did not.  Tompkins indicated that this February 18 letter was filed within the 60 days specified in the ESCA for the claim review process.  Defendants treated this letter as the first claim for review under the ESCA's two-step review process.

---

[83] *Id.* at 38.

Tompkins again challenged the Board's application of the "for cause" provision in the ESCA, arguing that Plaintiff voluntarily resigned and that he could not have been terminated for cause at the time of this resignation.

Tompkins also challenged the factual basis on which the Board terminated Plaintiff's benefits, and argued that it was arbitrary and capricious.  He complained that the December letter contained conclusory allegations without specific facts to support the termination decision, and that the Board failed to provide Plaintiff with the documents it relied on in support of its decision.  He argued that the KBI's investigation shows that the Bank was also to blame for the losses suffered by Nix and Feiling, and accused the Bank of using Plaintiff as a scapegoat. Tompkins argued that the KBI Affidavit was based on hearsay, and that to the extent it relies on Draper's interview, it should not carry weight because Draper has since been convicted in connection with the missing cattle.  Tompkins argued that any internal investigation the bank conducted was minimal, given that it did not reveal any witness statements or documents it relied on.

### Tuck's April 14, 2023 Letter—First Claim Denial

In an April 14, 2023 letter, Tuck wrote to Tompkins explaining that the Board denies Plaintiff's claim for benefits under the ESCA.  He reiterated the Board's position that it correctly interpreted the ESCA to allow for the Board's retroactive determination that Plaintiff was discharged for cause.  Tuck also specified in further detail the Board's reasons for the determination; namely, its discovery that Plaintiff had an undisclosed interest in the proceeds of loans to Nix, and that Plaintiff took active steps to conceal his interest in the proceeds of Nix's loans.  This letter also specifies violations of Guaranty's Code of Conduct Policy, and regulatory compliance laws.

***Tompkins' June 13, 2022 Letter—Second Claim Review***

Tompkins invoked the ESCA's provision for a second claim review in an 18-page letter dated June 13, 2022.  In it, he reasserted his prior arguments in favor of reinstating benefits. Additionally, Tompkins argued that the Board's internal review was inadequate because it did not include interviewing Plaintiff, and that the Board was operating under a dual conflict of interest because it both funds the plan, and is the plan administrator.  Tompkins continued that the Board had knowledge of many of the facts upon which the KBI Affidavit is based as far back as 2017, and challenged the facts upon which the Board's review decision was based.  At the end of Tompkins' letter, he argued that the Bank withheld from him several categories of records the Bank had produced to the KBI that undermine its decision to terminate Plaintiff's benefits.  And Tompkins specified ten categories of documents that he argued undermine the Board's decision, although "[i]t is unclear if the Board even reviewed these records, especially given the representations in your letter."[84]

On June 23, 2022, Tompkins notified Tuck by email that the State had dismissed the criminal charges against Plaintiff, attaching the Logan County Attorney's Dismissal notice.

***Tuck's August 11, 2022 Letter—Second Claim Denial***

In an August 11, 2022 letter, Tuck wrote to Tompkins explaining that the Board denies Plaintiff's second claim for benefits under the ESCA.  He again reiterated the Board's position that it correctly interpreted the ESCA to allow for the Board's retroactive determination that Plaintiff was discharged for cause, and its position that the merits of Plaintiff's criminal charges did not impact whether the forfeiture provision in the ESCA applied.

---

[84] *Id.* at 85.

Tuck again set forth the specific reasons for the Board's decision, and denied that the Bank or the Board was aware of "[t]he full scope of the partnership between Crawford and Nix, and their joint financial interest in Guaranty's loan proceeds and collateral."[85]  Tuck then set forth the Board's conclusions upon reviewing the KBI Affidavit and comparing it with the Bank's internal documents.  These facts, "[t]aken collectively," allowed the Board to find "that enough facts were present to support a determination that Crawford had an undisclosed interest in the proceeds of Nix's loans," upon which it based its "for cause" termination decision under the ESCA.[86]  One of the internal documents to which Tuck specifically referred was the Bank's disclosure form, which required officers and employees of the Bank to disclose any interest with a bank customer.  Tuck indicated that Plaintiff never disclosed his business relationship with Nix on these forms, which is a violation of the Bank's Code of Conduct, as well as banking regulations.

After the Board's second claim denial, Plaintiff filed this lawsuit.

## III.    Review of the Board's Decision

Plaintiff argues that the Board's termination decision was arbitrary and capricious for several reasons: (1) it incorrectly interpreted the Plan when it determined that it could terminate Plaintiff's benefits based on a retroactive determination that grounds "for cause" existed at the time he voluntarily resigned; (2) the initial termination decision and review denials contain several procedural irregularities; (3) the Board's conflict of interest; and (4) the decision was not based on substantial evidence.

### A.    Plan Interpretation

---

[85] *Id.* at 90.

[86] *Id.* at 91.

As already discussed, in considering whether the Board's decision was reasonable, one requirement is that the Board's decision must be "consistent with the purposes of the plan."[87] This "requirement means a plan administrator acts arbitrarily and capriciously if the administrator 'fail[s] to consistently apply the terms of an ERISA plan' or provides 'an interpretation inconsistent with the plan's unambiguous language.'"[88]  From the first letter giving Plaintiff notice of the Board's decision to terminate his benefits, the Board has consistently taken the position that its decision was based on the language in Section V(E) of the ESCA, which provides that benefits shall be forfeited "in the event the Executive shall be discharged for cause at any time (or if grounds 'for cause' exist at the time the Executive's employment terminates for any reason)."[89]  In Johnson's September 28, 2021 letter, he explained that at the time of Plaintiff's resignation, "there were multiple reasons, circumstances and events which existed and formed the grounds for the basis of termination . . . 'for cause' as defined in the ESCA."[90] Among the reasons listed were the loans to Feiling, Nix, and Draper.  Tuck's subsequent letters took the same position.

Thus, for the Board's decision to be arbitrary and capricious, the Court must find that it is inconsistent with the Plan's unambiguous language:

> "'Ambiguity exists where a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term.'"  In order to determine whether the plan is ambiguous, "we 'consider the common and

---

[87] *See, e.g.*, *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105, 111 (2008)), *cert. denied*, 144 S. Ct. 808 (2024).

[88] *Id.* (alteration in original) (quoting *Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020)).

[89] Doc. 74 at 142.

[90] *Id.* at 3.

> ordinary meaning as a reasonable person in the position of the plan
> participant . . . would have understood the words to mean.'"
>
> If a plan provision is ambiguous, under the arbitrary and capricious
> standard, then we "take a hard look and determine" whether the
> plan administrator's interpretation of the ambiguous language was
> "arbitrary in light of [the administrator's] conflict of interest."
> However, "if the plan provision is unambiguous, and the plan
> administrator's interpretation differs from the unambiguous
> meaning, then the plan administrator's interpretation is
> unreasonable, and the decision to deny benefits based on that
> interpretation is arbitrary and capricious."[91]

Plaintiff argues that the "for cause" parenthetical in Section V(E) of the ESCA is intended to apply to forced resignations or voluntary resignations "in the face of scrutiny that is imminently leading to a discharge 'for cause.'"[92]  In support of this interpretation, Plaintiff argues that the present tense use of the term "exist," instead of the past tense "existed," indicates that it does not apply to retroactive determinations about whether there was cause at the time of Plaintiff's resignation.  Plaintiff also points to the absence of language in the ESCA allowing the Board to conduct post-employment investigations.  Defendants respond that the ESCA is unambiguous, and applies to a situation like Plaintiff's where an executive retires, yet grounds for cause exist at the time.  They argue further that there is no temporal requirement in the ESCA's forfeiture provision.

"For cause" is defined within the ESCA provision, but "exist" is not.  The Court finds that despite the Plan's failure to define "exist,"  the ESCA's language is unambiguous.  The

---

[91] *Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1362–63 (10th Cir. 2009) (ellipses and alterations in original) (first quoting *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007); then quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008); and then quoting *Flinders*, 491 F.3d at 1193).  Plaintiff's reliance on Kansas contract law is unavailing.  Federal common law controls.  *See, e.g.*, *Miller*, 502 F.3d at 1248–49.

[92] Doc. 45 at 30.

dictionary definition of "exist" is "to have actual being."[93]  In the case of the forfeiture parenthetical, a reasonable person in Plaintiff's position would understand that even if he was not discharged for cause, where grounds for cause "have being" at the time he otherwise separated from employment, he would be subject to the forfeiture provision.  Plaintiff fails to persuade the Court that there is another reasonable interpretation of the word "exist" in the Plan, when read in conjunction with the forfeiture provision as a whole.

Plaintiff fails to explain how the present tense use of the word "exist" renders it ambiguous.  The parenthetical at issue unambiguously contrasts with the main clause—"in the event the Executive shall be discharged for cause at any time."[94]  It explicitly applies to the situation where the Executive is not discharged for cause, but instead terminates employment in some other way, yet grounds for cause exist at the time of termination.  Plaintiff argues that the Board's interpretation is "unreasonable because it would allow Defendants to use this provision as a way to retroactively recharacterize Plaintiff's voluntary resignation as termination 'for cause' any time."[95]  But a contrary reading would render this parenthetical language meaningless.  Indeed, if the Bank was aware that grounds for cause exist at the time of the retirement or resignation, there would be no need for this provision at all.

Moreover, there is no temporal limitation in the Plan for the Board's discovery that grounds for cause exist.  Thus, the Court finds that a reasonable person in Plaintiff's position would not understand that the forfeiture provision only applies in the case of a forced resignation or an "imminent" finding by the Board that there are grounds for cause.  As the Board argues, the plain meaning of the parenthetical was unambiguously intended to hedge against the situation

---

[93] *Exist*, Dictionary.com, https://www.dictionary.com/browse/exist (last visited May 13, 2024).

[94] Doc. 74 at 142.

[95] Doc. 66 at 14.

where "the Executive" resigns before the Bank discovers that cause exists.  The Court finds that

the Board's interpretation that the forfeiture clause applied to the plan administrator's subsequent

discovery that there were grounds "for cause" at the time of Plaintiff's retirement is reasonable.[96]

## B.      Procedural Irregularities

Plaintiff argues that the 2021 and 2022 letters from Johnson and Tuck violated ERISA's

procedural requirements.  29 U.S.C. § 1133 provides:

> In accordance with regulations of the Secretary, every employee
> benefit plan shall—
>
> (1) provide adequate notice in writing to any participant or
> beneficiary whose claim for benefits under the plan has been
> denied, setting forth the specific reasons for such denial, written in
> a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim
> for benefits has been denied for a full and fair review by the
> appropriate named fiduciary of the decision denying the claim.

The Department of Labor has developed regulations consistent with this statute, and Plaintiff

relies specifically on 29 C.F.R. § 2560.503-1(g) and (h).

### 1.      Notice of Adverse Benefit Determinations

Subsection (g) governs the notice of adverse benefit determination.  The notice must

include: "(i) The specific reason or reasons for the adverse determination; (ii) Reference to the

specific plan provisions on which the determination is based; [and] (iii) A description of any

---

[96] Even if the Court found that the term "exist" is ambiguous, it would still find that the Board's interpretation was reasonable.  "When a plan administrator is given authority to interpret the plan language, and more than one interpretation is rational, the administrator can choose any rational alternative."  *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999) (citation omitted).  The Board's interpretation of the forfeiture provision was a rational alternative.

additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."[97]

The Court concludes that Johnson's September 28, 2021 letter met the requirements of 29 C.F.R. § 2560.503(g).  The letter included the specific reasons for the adverse determination, and specifically referred to the plan provision upon which it was based—Section V(E) of the ESCA. The letter explained that the Bank recently learned that "during your tenure as an employee of the Bank, and specifically at the time of termination of your employment, there were multiple events, circumstances and actions you took that constitute" grounds for cause listed under Section V(E) of the ESCA.[98]  The letter specified that these actions "include, but are not limited to" Plaintiff's conduct extending credit to six different bank borrowers, including Feiling, Nix, and Draper.  The letter also reiterated Plaintiff's rights under the ESCA to proceed with a two-step claim review process.  Given the nature of the decision, there was no information or material required of Plaintiff to "perfect the claim," thus, none was listed.  While Plaintiff takes issue with the reasons for the Board's decision and argues it is inconsistent with the later claim review denial letters, the Court finds that this letter was in compliance with § 2560.503(g).

Plaintiff also argues that the September and December 2021 notice of termination of benefits letters did not comply with ERISA because they were written on behalf of the Bank or its counsel and not the Board, the plan administrator.  The Court does not find that this is a procedural error that impacts the Court's review.  The ESCA provides that the Board, as plan administrator, could delegate the employment of advisors and of ministerial duties to "qualified individuals."[99]  There is nothing under ERISA that "prevents that administrator from then

---

[97] 29 C.F.R. § 2560.503-1(g)(1)(i)–(iii).

[98] Doc., 74 at 3.

[99] *Id.* at 146–47, § X(A).

delegating portions of its discretionary authority to non-fiduciary third parties, as any similarly-situated trustee may do.  This is especially true when such delegation is explicitly authorized by the plan document."[100]  Johnson's September 28, 2021 letter explicitly referred to the decision as the "Board's," and he is the President of the Bank and a member of the Board.  Tuck's December 21, 2021 letter to Tompkins was in direct response to Tompkins' October 22, 2021 letter to him, and instructed him to follow the claims review process set forth in the ESCA going forward, which he did.  After this October 2021 letter, the Board considered Tompkins' next two lengthy letters as part of the two-step claim review process available to Plaintiff under the ESCA. Therefore, even if the Court considered these two letters as including "procedural irregularities," because they were not signed by the Board itself, they achieved the requisite notice of the basis for the Board's decision, the provision in the Plan upon which it relied, and the information Plaintiff needed to invoke the claim review process under the ESCA.

## 2.  Full and Fair Review

Next, Plaintiff argues that the Board did not comply with ERISA's procedural regulations that govern the claim review process.  Section 2560.503-1(h) requires "a full and fair review of the claim and the adverse benefit determination."[101]  As part of that full and fair review, a claimant is entitled to "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits," and the claims procedure must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim."[102]  "[F]ull and fair review of a denial must include: 'knowing what evidence the decision-maker relied upon, having an

---

[100] *Geddes v. United Staffing All. Emp. Med. Plan*, 469 F.3d 919, 926 (10th Cir. 2006).

[101] 29 C.F.R. § 2560.503-1(h)(1).

[102] 29 C.F.R. § 2560.503-1(h)(2)(iii), (iv).

opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'"[103]  The Tenth Circuit recently explained that "the concern is whether administrators rely on internal records and evidence to make benefits determinations and then withhold those reasonings from claimants.  Our caselaw and ERISA regulations proscribe this practice."[104]

Plaintiff argues that he was denied a full and fair review because the Board ignored the evidence discussed in his claim review letters, did not conduct a sufficient independent investigation of the underlying facts, and failed to provide him with all of the documents it considered when making the adverse benefit decision.  The Court agrees.

Tuck represented to Tompkins in several letters that the Board conducted an internal investigation after receiving the KBI Affidavit.  All three of his response letters reference the Board's review of internal documents that it claims corroborated information it received from the KBI about Plaintiff's self-dealing and concealment of information from the Bank.  For example, in Tuck's December 21, 2021 letter to Tompkins, Tuck stated that "Guaranty conducted an internal investigation into the facts and circumstances set forth in the [KBI] Affidavit."[105]  After a comprehensive review of the facts upon which he claims the Board made its findings, he concluded that "[t]he results of Guaranty's investigative findings in its own records, coupled with the KBI's investigation, fully support Guaranty's decision to terminate Mr. Crawford's

---

[103] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988)), *cert. denied*, 144 S. Ct. 808 (2024).

[104] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1226 n.15 (10th Cir. 2023) (citations omitted).

[105] Doc. 74 at 36.

benefits provided for in the ESCA."[106]  He also indicated that Plaintiff's conduct "breach[ed] multiple federal and state banking laws."[107]

Similarly, in the April 14, 2022 letter, Tuck twice refers to the Board's "review of internal documents, correspondence, interviews with Guaranty employees, and information brought to light by the KBI's investigation, [where] it was discovered that during Crawford's tenure with Guaranty he had an undisclosed interest in the proceeds of loans to certain customers of Guaranty."[108]

And in his August 11, 2022 letter, Tuck stated that "Guaranty was not aware of the full scope of Crawford's involvement with Nix until the details were disclosed as a result of the KBI's investigation.  Upon this discovery, Guaranty caused to be completed a thorough review of all files pertaining to Crawford, Nix, and Draper."[109]

Despite representing that the Board conducted an internal review of the Bank's documents after receiving the KBI Affidavit, the only information in the administrative record other than the parties' letters are the KBI Affidavit, the Crawford Criminal Complaint, the Bank's Code of Conduct Policy, Plaintiff's Post Retirement Health Insurance Benefit Plan Agreement, the ESCA, the Split Dollar Agreement, and Board Meeting Minutes.  There are no other internal documents included in the administrative record, nor any reference to an internal investigation or findings, despite the Board's repeated representations to Plaintiff that it conducted an internal investigation.  Plaintiff was entitled to know about any documents the Board considered in making its termination decision, and he repeatedly asked for this

---

[106] *Id.* at 38.

[107] *Id.* at 36–37.

[108] *Id.* at 65.

[109] *Id.* at 90.

information.[110]  As a practical matter, the Court is unable to review a decision for reasonableness that was based, at least in part, on an internal investigation when the record of that internal investigation is missing.  While the letters included in the administrative record state the Board's conclusions, the record does not include the documents the Board reviewed or the witnesses it interviewed.  This was a procedural error.

The Court also agrees with Plaintiff that Tuck's letters in response to his claim review requests failed to address the evidence Plaintiff submitted for review, including the dismissal of the criminal case against him, and the evidence he claimed rebutted the KBI Affidavit.  While Tuck's letters rebutted some of the arguments presented by Tompkins in his claim review letters, they do not specifically address the evidence that he submitted in support of the parties' many factual disputes.  And, in answering these arguments, Tuck relied on the Board's internal investigation that was neither disclosed to Plaintiff nor included in the administrative record.

The Board argues that Plaintiff must show prejudice from a procedural irregularity for the Court to find its decision arbitrary and capricious.  To be sure, the Tenth Circuit applied a substantial compliance test in applying the pre-2002 version of 29 C.F.R. § 2560.503-1, whereby if "the administrator's decision was in 'substantial compliance' with ERISA deadlines, then, if otherwise warranted, [it] would still afford deference to the benefits decision."[111]  The Tenth Circuit has not resolved whether the substantial compliance doctrine applies to this regulation

---

[110] *See, e.g.*, *id.* at 41, 46 (pointing out in his February 18, 2022 letter that the Board did "not disclose any witnesses you talked to or any documents you relied upon," and arguing that the Board provided "no description of what the internal investigation is."); *id.* at 47 (arguing that the December 21, 2021 letter "fails to discuss how it was able to conduct a thorough internal investigation in two weeks."); *id.* at 69 (seeking details about specific loans the Board claims Plaintiff had an undisclosed interest in and specific alleged misrepresentations); *id.* at 85 (providing list of ten categories of records Plaintiff claims the Bank should have produced to the KBI that would buttress his claim, and asking if the Board reviewed them).

[111] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 799 (10th Cir. 2010) (citation omitted).

after it was revised in 2002.[112]  But assuming it still applies, the Court would find that the Board was not in substantial compliance.

An administrator substantially complied with the regulation "if the procedural irregularity was '(1) "inconsequential"; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant.'"[113]  The Court finds that the procedural irregularities here were not inconsequential.  The Board claimed to have based its decision in part on an internal investigation, the details and findings of which were not provided to Plaintiff.  The dispute between the parties about whether cause existed at the time Plaintiff's employment terminated is a highly factual one.  The Board claims it learned for the first time about the extent of Plaintiff's involvement in the Draper feedlot scheme when it received the KBI Affidavit, and that it proceeded to conduct an internal investigation that corroborated the conclusions in the affidavit.  Given Plaintiff's many factual challenges to the KBI Affidavit and Draper's credibility, Plaintiff was entitled to know how the Bank's internal investigation corroborated the KBI Affidavit, particularly since this investigation apparently took place over a two-week time frame between the date of the affidavit and Johnson's letter to Plaintiff.

Similarly, the Court does not find that the procedural irregularity was part of a good-faith exchange of information between the parties.  In fact, the procedural irregularity itself is due to a failure by the administrator to exchange information with Plaintiff, both by failing to provide him with all of the records it based its decision on and by failing to address the documents that Plaintiff asked the Board to consider during the claim review process.  For these reasons, even if

---

[112] *Id.*; *see Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 828 (10th Cir. 2008) (acknowledging that the 2002 ERISA regulations may have called into question the substantial compliance rule but declining to decide the issue).

[113] *LaAsmar*, 605 F.3d at 800 (quoting *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1174 (10th Cir. 2004)).

the substantial compliance doctrine still applies, Defendants did not substantially comply with the governing regulation.

### C.    Conflict of Interest

Plaintiff argues that the Court should consider two types of conflicts of interest in this case and adjust its deference accordingly.  First, he points to an inherent conflict of interest, which is when a plan administrator acts as both "evaluator and payor of the claim."[114]  Second, he points to a financial conflict of interest because the Board members have a financial incentive to deny Plaintiff his retirement benefits.  Plaintiff points out that the Board had an incentive not to terminate his benefits until after the covenant not to compete under the ESCA expired in April 2021, and to shift the blame for the cattle deaths and bank losses to Plaintiff.

Under the combination-of-factors approach required under *Glenn*, the Court will give more weight to a conflict "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."[115]  However, the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."[116]

There is no evidence in the record about any other decisions the Board has made in its role as plan administrator.  However, the Court is mindful that Plaintiff was the only beneficiary under this plan.  And the plan administrator, unlike many of the ERISA cases dealing with conflicts of interest, is the Bank's Board of Directors, not an insurance company.  The evidence

---

[114] *Winfrey v. Hartford Life & Accident Ins. Co.*, 127 F. Supp. 3d 1153, 1162 (D. Kan. 2015) (citation omitted).

[115] *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (citation omitted).

[116] *Id.* (citation omitted).

shows that the Board did hire outside counsel for advice, and it allowed Plaintiff to appeal its decision twice in support of his claim.  But there is no evidence that the Board engaged in efforts to "wall[] off claims administrators from those interested in firm finances," or "impos[e] management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."[117]

The Court agrees with Defendants that the evidence does not support that the Board's generic financial interest in withholding Plaintiff's retirement benefits played a role in its decision to terminate his benefits.  The records submitted by Defendants, and produced to Plaintiff during discovery, make clear that the Bank had already set aside the funds required under the ESCA.

Yet, there are other circumstances in this case that suggest a conflict of interest played at least some role in the Board's decision.  The timing calls into question whether the Board's conflict weighed into its decision, particularly when viewed in conjunction with the limited administrative record provided.  The Board maintained in its letters that it was unaware of the full extent of Plaintiff's alleged self-dealing and misrepresentations until it was provided with the KBI Affidavit.  There is no evidence in the record about when exactly the KBI Affidavit was provided to the Board, but the Court assumes for purposes of this analysis that it was received on the date it was signed and Plaintiff was criminally charged—September 14, 2021.

Despite the Board's representations in its letters, the record suggests the Bank had some awareness of Plaintiff's self-dealing involving Draper, Nix, and Feiling prior to September 14, 2021.  According to the affidavit, the KBI's investigation began in April 2019, one year before Plaintiff resigned.  The KBI received copies of the Bank's inspection reports at this time, and at

---

[117] *Id.* (citations omitted).

some point conducted interviews with several Bank employees.  And, according to the KBI Affidavit, Plaintiff "was removed from his official duties as Nix and Feiling's loan officer in October or November of 2018."[118]  Plaintiff told investigators that "Johnson, the president of GSB, was fully aware of" his arrangement with Nix, whereby he would receive a percentage of the profit or loss incurred on cattle that Nix was feeding, and Johnson allowed it to continue.[119]

Despite the ongoing investigation, Plaintiff was not discharged for cause in April 2020. He voluntarily resigned.  Despite some knowledge of the KBI's investigation, the Board waited until the one-year covenant not to compete expired before giving Plaintiff notice that it was terminating his benefits.  Additionally, the Board represented that it conducted an internal investigation during the two-week period between when the KBI Affidavit was signed and when the Board sent its initial notice of termination letter to Plaintiff.  While that original letter did state that it was based on Plaintiff's "actions related to the Bank's extensions of credit to" several Bank borrowers including Feiling, Nix, and Draper, it did not mention an internal investigation.[120]  The Board voted on whether to terminate Plaintiff's benefits at its September 23, 2021 meeting, but the minutes from that meeting do not mention the existence or results of any internal investigation.  The internal investigation was mentioned for the first time in Tuck's December 2021 letter to Tompkins.

Similarly, the Board's rationale changed between the initial termination decision and Tuck's subsequent letters, which is evidence that the Board's decision was influenced by its conflict of interest.  The initial letter identified the four categories of "cause" it determined had been found as defined in the ESCA.  It generally identified Plaintiff's "actions related to the

---

[118] Doc. 74 at 119.

[119] *Id.*

[120] *Id.* at 4.

Bank's extensions of credit" to six borrowers.  Yet, its subsequent letters referred only to three of

these borrowers—Feiling, Nix, and Draper—and made an additional claim that Plaintiff made

misrepresentations to the Bank.  Tuck's subsequent letters also identified for the first time that

Plaintiff violated federal and state banking laws.

And, as part of the underlying factual dispute, Plaintiff argues that Johnson knew about

his conduct with Nix, Feiling, and Draper well before he resigned.  Yet, the Board disputes this

fact in the administrative record and in their motion before this Court.  Johnson was a member of

the Board that made the decision to terminate Plaintiff's benefits, another fact that suggests a

conflict of interest may well have factored into the Board's decision.

In sum, the Court finds some indicia in the record that the Board operated under a

conflict of interest that factored into its benefits decision.  This requires the Court to reduce its

deference to the plan administrator's decision to terminate Plaintiff's benefits.  The Court finds

that the Board's failure to comply with ERISA's procedural regulations during the claim review

process, coupled with evidence that the Board's conflict-of-interest impacted its decision,

renders the Board's decision arbitrary and capricious.

### D.       Remedy

Having concluded that the Board's decision was arbitrary and capricious, the Court must

determine whether to remand the case back to the Board, or award benefits.  This decision

"hinges on the nature of the flaws in the administrator's decision."[121]  Generally, the Court

should remand where "the administrator failed to make adequate factual findings or failed to

adequately explain the grounds for the decision."[122]  However, "if the evidence in the record

---

[121] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021) (quoting *Weber v. GE Grp. Life Assurance Co*., 541 F.3d 1002, 1011 (10th Cir. 2008)).

[122] *Id.* (quoting *Weber*, 541 F.3d at 1011).

clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[123]

Here, the Court finds that the Board's interpretation of the Plan was reasonable.  But the Court found error because the Board did not include any record of its internal investigation in the administrative record, nor did it produce the record of this investigation to Plaintiff or address all of the evidence he referenced during the administrative review process.  The Board's failure to conduct a full and fair review interferes with this Court's ability to review the record for reasonableness—it cannot determine whether the Board's decision was based on substantial evidence, nor that "the record clearly shows" that Plaintiff is entitled to benefits.  Therefore, the Court remands to the Board to conduct a full and fair review in accordance with 29 C.F.R. § 2560.503-1(h).[124]  Plaintiff's requests for prejudgment interest and attorney's fees are therefore premature and the Court denies both requests without prejudice.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Strike Extra-Record Evidence (Doc. 64) is **granted in part and denied in part**.  The motion is granted as to Plaintiff's Declaration (Doc. 44-23).  The motion is otherwise denied as explained in this Order.

**IT IS FURTHER ORDERED BY THE COURT** that Defendants' Motion for Judgment on Plaintiff's ERISA Claim (Doc. 42) is **denied**.  Plaintiff's Motion for Summary Judgment (Doc. 44) is **granted**.  Plaintiff's ERISA claim is remanded to the plan administrator for a renewed evaluation of his case.  Plaintiff's requests for prejudgment interest and attorney's fees are denied without prejudice.

**IT IS SO ORDERED.**

---

[123] *Id.* (quoting *Weber*, 541 F.3d at 1015).

[124] *See Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1290 (10th Cir. 2002).

Dated: May 23, 2024

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE