**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **DAVID CRAWFORD,**<br><br>**Plaintiff/Counterclaim Defendant,**<br><br>**v.**<br><br>**THE GUARANTY STATE BANK & TRUST COMPANY, et al.,**<br><br>**Defendants/Counterclaim Plaintiffs.** | **Case No. 22-2542-JAR-GEB** |

**MEMORANDUM AND ORDER**

Plaintiff David Crawford brings this lawsuit against his former employer, The Guaranty State Bank & Trust Company ("the Bank"), and The Executive Salary Continuation Plan for the Bank through its Board of Directors ("the Board") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"),[1] seeking to recover supplemental retirement income under an employee benefit plan.[2] Defendants allege counterclaims for recoupment. This matter is before the Court on the parties' cross motions for summary judgment on Plaintiff's ERISA claim (Docs. 105, 109). The motions are fully briefed, and the Court is prepared to rule. As described more fully below, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment.

## I. Procedural History

Seventeen months after Plaintiff voluntarily resigned from the Bank, the Bank notified him that his retirement benefits under the Executive Salary Continuation Agreement for The Guaranty State Bank & Trust Company ("the Plan" or "ESCA") were terminated. Defendants

[1] 29 U.S.C. §§ 1001–1193c.

[2] Doc. 1.

claim the Board terminated Plaintiff's benefits under the Plan because they discovered evidence that Plaintiff engaged in self-dealing, breached his duty of loyalty to the Bank, and breached the Bank's trust at the time he resigned. Plaintiff challenged the termination of benefits decision on several grounds.

On May 24, 2024, this Court ruled on the parties' original cross-motions for summary judgment on Plaintiff's ERISA claim ("May 2024 Order").[3] The Court determined that the Board's interpretation of the Plan—that the Plan's forfeiture clause applied to the plan administrator's subsequent discovery that there were grounds "for cause" at the time of Plaintiff's resignation—was reasonable. But the Court found that the administrative record did not include documents or witness statements from the internal investigation the Board referenced in its denial letters, the Board did not produce the record of its internal investigation to Plaintiff, and the Board did not address evidence Plaintiff submitted during the administrative review process. The Court also found some evidence that the Board's inherent conflict of interest may have played a role in its decision. Thus, the Court found that the Board's failure to conduct a full and fair review of Plaintiff's claim interfered with this Court's ability to review the record for reasonableness, and therefore, the decision was arbitrary and capricious. The Court remanded the matter to the Board to conduct a full and fair review in accordance with 29 C.F.R. § 2560.503-1(h).[4]

---

[3] Doc. 75.

[4] *See Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288–89 (10th Cir. 2002) ("The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation. A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (citations omitted))).

On November 24, 2024, the Board issued a renewed decision to terminate Plaintiff's benefits under the Plan. Plaintiff again exhausted the appeal process provided for in the ESCA. After doing so, he filed an Amended Complaint, asserting a renewed claim under ERISA against Defendants based on the 2024 decision on remand to terminate his benefits.[5] Plaintiff claims in his amended pleading that he did not receive a full and fair review of his claim on remand and that the Board's decision was neither reasonable nor based on substantial evidence. Defendants assert five counterclaims against Plaintiff for recoupment on the basis of fraudulent misrepresentation and omission, conversion, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and negligence under Kansas law.[6]

The parties agreed that no further discovery was necessary and that they would proceed to file cross-motions for summary judgment on Plaintiff's renewed ERISA claim. If Plaintiff prevails, the parties will submit a schedule for discovery on the counterclaims.[7] They have now filed cross-motions for summary judgment on Plaintiff's ERISA claim.

## II. Standard of Review

Plaintiff's ERISA claim arises under 29 U.S.C. § 1132(a), which allows a beneficiary to bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[8] Summary judgment in an ERISA case is "merely a vehicle for deciding the case; the factual

[5] Doc. 90.

[6] Doc. 97 ¶¶ 62–98.

[7] *See* Doc. 96 at 6.

[8] 29 U.S.C. § 1132(a)(1)(B).

determination of eligibility for benefits is decided solely on the administrative record, and the nonmoving party is not entitled to the usual inferences in its favor."[9]

As this Court previously explained, it reviews the denial of ERISA benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[10] "'Where the plan gives the administrator discretionary authority,' and 'procedural irregularities' did not infect the administrator's decision," the Court applies "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[11] Under this standard, the Court reviews the administrator's decision for abuse of discretion.[12]

Here, the ESCA gives the Board discretion to determine Plaintiff's eligibility for benefits.[13] Where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest,"[14] the Supreme Court counsels that the conflict of interest does not change the standard "from deferential to *de novo* review."[15] Instead, the deferential standard of review continues to apply and the conflict is "one factor among many that a reviewing judge must take into account."[16] Similarly, if there are procedural irregularities such as a failure to provide a full and fair explanation for the denial decision, the Court applies the

[9] *Ian C. v. UnitedHealthcare Ins.*, 87 F.4th 1207, 1217 (10th Cir. 2023) (quoting *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021)).

[10] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[11] *E.W. v. Health Net Life Ins.*, 86 F.4th 1265, 1294 (10th Cir. 2023) (alteration omitted) (quoting *LaAsmar*, 605 F.3d at 796).

[12] *See Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012).

[13] Doc. 74 at 147.

[14] *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 111 (2008) (emphasis omitted) (quoting *Firestone*, 489 U.S. at 115).

[15] *Id.* at 115.

[16] *Id.* at 116.

arbitrary-and-capricious standard of review, and addresses whether the plan administrator's failure to provide sufficient notice of the reasons for denial, or the evidence upon which it relied, meets that standard.[17]

Thus, the Court applies an arbitrary-and-capricious standard of review, but considers any conflict of interest and procedural irregularity as part of that analysis. The Tenth Circuit "treats the abuse-of-discretion standard and the arbitrary-and-capricious standard as 'interchangeable in this context,' and 'applies an arbitrary and capricious standard to a plan administrator's actions.'"[18] The plan administrator's decision will be upheld "so long as it was made on a reasoned basis and supported by substantial evidence."[19]

---

[17] *See, e.g.*, *D.K. v. United Behav. Health*, 67 F.4th 1224, 1235–44 (10th Cir. 2023) (finding that the plan administrator "acted arbitrarily and capriciously in not providing analysis or citations to the medical record in its denial letters"); *David P. v. United Healthcare Ins.*, 77 F.4th 1293, 1309–13 (10th Cir. 2023) (considering procedural irregularities, including failure to fully explain its decision, in finding that plan administrator's decision was arbitrary and capricious); *E.W. v. Health Net Life Ins.*, 86 F.4th 1265, 1295 (10th Cir. 2023) (considering whether denial letters provided a reasoned explanation for the decision under an arbitrary-and-capricious standard of review).

[18] *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231–32 (10th Cir. 2012) (quoting *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 & n.2 (10th Cir. 2004) (per curiam), *abrogated on other grounds by Glenn*, 554 U.S. at 118).

[19] *Ian C. v. UnitedHealthcare Ins.*, 87 F.4th 1207, 1219 (10th Cir. 2023) (quoting *Van Steen v. Life Ins. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018)). In its May 2024 Order, the Court determined that the ESCA was not a "top-hat" plan because it designated the Board as an ERISA fiduciary. Doc. 75 at 13. "A 'top-hat' plan is a benefit 'plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.' Such a plan is generally governed by [ERISA] as a defined benefit plan, but not all aspects of ERISA apply to such plans." *Hoak v. Ledford*, 153 F.4th 1148, 1153 (11th Cir. 2025) (quoting 29 U.S.C. § 1051(2)) (citations omitted). Plaintiff continues to maintain that the ESCA is not a top-hat plan, while Defendants argue that it is. The circuits disagree about the appropriate standard of review for top hat plans, and the Tenth Circuit has not weighed in. *Compare Goldstein v. Johnson & Johnson*, 251 F.3d 433, 441–44 (3d Cir. 2001) (holding that a *de novo* standard of review applies), *with Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011) (rejecting the Third Circuit's approach and applying arbitrary-and-capricious review under *Firestone*). But, as the First Circuit explained in *Niebauer v. Crane & Co.*, when a top-hat plan grants discretion to the plan administrator, even under a *de novo* standard of review, ordinary contract principles apply and the plan is reviewed for reasonableness. 783 F.3d 914, 923 (1st Cir. 2015). Thus, even if the Court determined that the ESCA was a top-hat plan that triggers *de novo* review, because it grants discretion to the Board, the Court would apply a reasonableness standard, as it does throughout this opinion. Therefore, it would not change the result.

## III. Administrative Record

### A. Scope of the Administrative Record

On October 3, 2025, the parties filed a Joint Stipulation regarding the scope of the administrative record on remand.[20] They agreed that it includes: (1) the original administrative record that was produced by Defendants in the initial phase of the litigation before remand;[21] (2) documents generated during remand that are bates numbered REM00001 to REM00491;[22] (3) Plaintiff's February 2025 appeal letter and accompanying exhibits;[23] and (4) KBI video excerpts played for the Board and produced to Plaintiff as part of the administrative file.[24] The Court further finds that the Board's November 20, 2024 notice of its termination decision,[25] and its final letter denying Plaintiff's appeal are part of the administrative record.[26]

The parties dispute whether the Board's Meeting Minutes from its November 5, 2024 meeting are properly included in the administrative record.[27] As the Court previously explained to the parties, the "administrative record" in an ERISA case includes "the materials compiled by

---

[20] Doc. 102.

[21] Doc. 74.

[22] Docs. 107 (filed under seal); 109-13, 109-14, 109-15. Once again, the parties declined to file a complete version of the administrative record to aid in the Court's review. Instead, they each included portions of it in separate attachments to their briefs. *See* Doc. 73 (noting that the parties failed to file the full administrative record on the first round of summary judgment motions and directing Defendants to separately file it). The Court attempts to identify all docket entries in this section that it considers part of the administrative record that it may consider when reviewing the Board's decision under the arbitrary and capricious standard.

[23] Docs. 106-4; 109-2 through 109-11.

[24] Docs. 120, 121, 122 (filed conventionally under seal).

[25] Docs. 106-3; 109-1.

[26] Docs. 106-5; 109-4. These letters are undeniably part of the administrative record, even though they were excluded from Doc. 107. *See* 29 C.F.R. § 2560.503-1(m)(8)(ii); *D. K. v. United Behav. Health*, 67 F.4th 1224, 1239 (10th Cir. 2023) ("The district court was correct to focus its review on the denial letters. ERISA denial letters play a particular role in ensuring full and fair review.").

[27] Doc. 106-2.

the administrator in the course of making his decision."[28] This includes materials submitted to and by the plan administrator before it issued its final denial.[29]

The Court finds that the November 5, 2024 Board Meeting Minutes are part of the administrative record. At this four-hour meeting, the Board considered Plaintiff's remanded claim for benefits and made the decision to deny his claim. The minutes from that meeting were clearly generated in the course of making a benefit determination.[30] Plaintiff maintains that the Court should give these minutes "little to no weight" because they were not provided to him before he submitted his administrative appeal, depriving him of the ability to challenge the accuracy and reliability of the minutes,[31] citing *D.K. v. United Behavioral Health*.[32] The Tenth Circuit's decision in *D.K.* does not discuss what type of documents must be provided to a claimant before filing an administrative appeal in order to be considered part of the administrative record. That case discusses the full-and-fair-review and meaningful-dialogue requirements under ERISA's regulations.[33]

Moreover, Plaintiff cites no authority that the Board minutes were required to be produced prior to his administrative appeal. It was the denial letter, and not the minutes, that is eligible for this Court's review.[34] The Board minutes were produced to Plaintiff on April 18, 2025, with the final termination decision.[35] They were generated by the administrator in the

---

[28] *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002).

[29] *See Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co*., 491 F.3d 1180, 1193 (10th Cir. 2007), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).

[30] 29 C.F.R. § 2560.503-1(m)(8)(ii).

[31] Doc. 116 at 29.

[32] 67 F.4th 1224, 1239–40 (10th Cir. 2023).

[33] *Id.*

[34] *Ian C. v. UnitedHealthcare Ins.*, 87 F.4th 1207, 1226 (10th Cir. 2023).

[35] Doc. 102 ¶ 5.

course of making its decision. Indeed, it memorializes the meeting during which the Board deliberated over and voted to terminate Plaintiff's benefits on remand. The Court therefore considers it as part of the administrative record.[36] To the extent Plaintiff argues that the Board's failure to provide it to him prior to his appeal was a procedural error that demonstrates an arbitrary and capricious decision, that is a different question that the Court will consider when it reviews Plaintiff's procedural objections to the termination decision on remand.

**B. Relevant Facts**

The following facts are derived from the administrative record.[37]

***The ESCA***

Plaintiff David Crawford began his employment with the Bank in September 1990 and worked there for approximately 29 years. On January 25, 2002, Plaintiff and the Bank entered into the ESCA, which provides in part:

> [I]t is the intent of the parties that this Agreement be considered an unfunded arrangement maintained primarily to provide supplemental retirement benefits for the Executive, and be considered a non-qualified benefit plan for purposes of the Employee Retirement Security Act of 1974, as amended ("ERISA"). The Executive is fully advised of the Bank's financial status and has had substantial input in the design and operation of this arrangement . . . .[38]

The ESCA makes clear that the Bank has "no obligation to set aside, earmark or entrust any fund or money with which to pay its obligations under this Agreement."[39] And it "reserves the

[36] To the extent Plaintiff's objection extends to the April meeting minutes, the Court's ruling applies to that objection as well.

[37] The Court incorporates by reference its discussion of the first administrative record from its May 24, 2024 Order. Doc. 75 at 19–31. In that Order, the Court set forth the relevant provisions of the ESCA and the many letters between the parties through the first administrative appeal process. The Court declines to repeat in detail all of the facts it already recited in in that order.

[38] Doc. 107 at REM00003.

[39] *Id.* at REM00006, § VIII.

absolute right, at its sole discretion, to either fund the obligations undertaken by this Agreement or to refrain from funding the same and to determine the extent, nature and method of such funding."[40]

The benefits under the agreement were "granted by the Bank as a fringe benefit . . . and are not part of any salary reduction plan or an arrangement deferring a bonus or a salary increase."[41] In order to fully vest retirement benefits under the ESCA, Plaintiff was required to remain employed by the Bank through the tenth anniversary of the date of the agreement, which was January 25, 2012, and his employment had to terminate on or after reaching age 65.[42] His benefit would be available under a reduced formula if his employment terminated before turning 65 but after the ten-year anniversary of the agreement.

However, even if Plaintiff's retirement benefits fully vested, the ESCA provides a forfeiture exception:

> Notwithstanding the foregoing, in the event the Executive shall be discharged for cause at any time (or if grounds "for cause" exist at the time the Executive's employment terminates for any reason), all benefits provided herein shall be forfeited. The term "for cause" shall mean any of the following that may have an adverse effect on the Bank: (i) gross negligence or gross neglect; (ii) the commission of a felony or gross misdemeanor involving moral turpitude, fraud, or dishonesty; (iii) the willful violation of any law, rule, or regulation (other than a traffic violation or similar offense); (iv) an intentional failure to perform stated duties; or (v) a breach of fiduciary duty involving personal profit.[43]

Part X of the ESCA is the ERISA Provision. It states that the Board is the named fiduciary and plan administrator, and that it

---

[40] *Id.*

[41] *Id.* at REM00004, § II.

[42] *Id.* at REM00004–REM00005, § V(A), (C).

[43] *Id.* at REM00005, § V(E).

> may delegate to others certain responsibilities under the Agreement including the employment of advisors and the delegation of ministerial duties to qualified individuals. This Agreement shall be interpreted and administered by the Board in good faith but in its sole discretion. The Board's decisions, unless arbitrary and capricious, shall be entitled to deference.[44]

Part X(B) provides for a review procedure if "a dispute arises over benefits under this Agreement and benefits are not paid to the Executive and such claimant feels he or she is entitled to receive such benefits."[45]

***Pre-Remand Termination of Benefits Decision***

Plaintiff resigned from the Bank in April 2020, more than ten years after the tenth anniversary of the agreement. He turned 65 years old in November 2021. On September 23, 2021, the Board held its monthly meeting. Ten members of the Board attended, including Douglas Johnson, the Bank President. At the meeting, the Board reviewed a "recommendation from Greyson Tuck," and "[t]he attached Johnson Doug & Frasier Curtis Letter 2 – Dave Crawford and Crawford – Notice of Termination of Benefits."[46] The Board "moved to proceed immediately with a letter to Mr. Crawford," which "carried."[47]

On September 28, 2021, Johnson sent Plaintiff a letter setting forth the Bank and Board's decision to terminate his benefits under the forfeiture provision of the ESCA. The letter cited the following bases for cause: (1) gross negligence or gross neglect; (2) willful violation of any law, rule, or regulation; (3) intentional failure to perform stated duties; and (4) breach of fiduciary duties involving personal profits. Johnson's letter stated:

---

[44] *Id.* at REM00009–REM00010, § X(A).

[45] *Id.* at REM00010, § X(B).

[46] Doc. 74 at 160.

[47] *Id.*

> These actions as an employee of the Bank, which include, but are not limited to, your actions related to the Bank's extensions of credit to the following Bank borrowers:
>
> • S&S Investments of Kansas, LLC
> • Greg Koenigsman
> • Ottawa County Feedlot
> • Mark Feiling
> • Mike Nix, and
> • Chad Draper[48]

As the Court set forth in its May 2024 Order, a probable-cause affidavit executed by Kansas Bureau of Investigation ("KBI") Special Agent Clint Brock on September 14, 2021 ("KBI Affidavit"), was provided to the Board before the Board made its original termination decision. Highly summarized, the affidavit set forth the KBI's investigation into approximately 1,600 missing head of cattle from the Draper Cattle Company, a cattle feedlot owned by Chad Draper in Logan County, Kansas. Draper was a bank customer, as were Michael Nix and Mark Feiling—out-of-state Bank customers who fed cattle with Draper starting in 2015 and 2016. Plaintiff was removed as the loan officer on these loans in November 2018.

The Bank sent Clint Shoemaker and Tony King to conduct an onsite inspection of the Draper feedlot on April 2, 2019, and discovered the 1,660 missing head of cattle—960 of Feiling's and 700 of Nix's. They also learned that Draper sold his farm and feedlot through a "quick sale," and paid his outstanding loan note with the Bank. Shoemaker and King notified Logan County Sheriff Pat Parsons, who requested assistance from the KBI. As part of its investigation, KBI agents interviewed Draper several times, as well as Plaintiff, other bank customers, bank employees, and Draper's wife.

[48] *Id.* at 4.

The KBI Affidavit also indicates that, even after Plaintiff was removed from working on the Nix and Feiling loans in late 2018, he continued to maintain contact and perform informal inspections of their cattle. Plaintiff told the KBI that he had an arrangement with Nix "in which he would receive either fifteen or twenty percent of the profit or loss incurred on cattle that Nix was feeding."[49] Plaintiff did not deny instructing Draper to sell his property, but told agents that Johnson was fully aware of his arrangement with Nix. Nix confirmed that he and Plaintiff had "a running partnership on cattle. The terms of the partnership are to share in the profit and loss on cattle fed in Kansas."[50] Nix also told the KBI that the partnership was "still active on cattle currently being fed at Draper's," that Plaintiff was to receive a share of the profit or be responsible for a share of the loss when cattle at Draper's were finished and sold, and that Plaintiff had paid him approximately $20,000 so far in cattle losses.[51]

The affidavit concluded:

> Based on the information obtained throughout this investigation, Crawford knowingly withheld information from the GSB, Nix and Feiling provided to him by Draper that could have prevented the aforementioned losses incurred by Feiling and Nix. Crawford withheld this information for personal gain in an attempt to eventually recoup losses he would personally face due to the high death loss of cattle he was a primary partner in with Nix.
>
> . . . .
>
> GSB allowed the engagement of poor accounting principles with little or no accurate method of ensuring the best interest of Nix and Feiling. The principles set forth in the oversight of the cattle loan agreements allowed for inaccurate inspections and counting, death loss tracking, and feed supply billing that negatively impacted the financial responsibility of Nix and Feiling. This accounting method, according to Draper, was instituted at the request of

---

[49] *Id.* at 119.

[50] *Id.* at 120.

[51] *Id.*

> Crawford, the acting loan officer for Draper, Nix and Feiling at the time.
>
> According to GSB records received on Friday, September 11, 2020, Nix has a current outstanding balance of $684,007.72, Feiling has a current outstanding balance of $1,325,876.89.[52]

On the same date that the KBI Affidavit was signed, Plaintiff was criminally charged in Logan County, Kansas District Court with two felonies: Impairing a Security Interest in violation of K.S.A. § 21-5830(a)(3), and Making False Information in violation of K.S.A. § 21-5824(a), arising out of the facts set forth in the KBI Affidavit.

Special Agent Brock also swore an oath for a criminal complaint/information against Draper, which was filed the year before, on December 31, 2020, charging Draper with two counts of theft, one count of impairing a security interest with the intent to defraud the Bank, and one count of making false information. Draper pled guilty on August 12, 2021, and was sentenced to a term of probation. On June 22, 2022, the Logan County Attorney dismissed the State's criminal case against Plaintiff without prejudice, "based on conversations with Defendant's counsel, the Kansas Bureau of Investigation, and the Federal Deposit Insurance Corporation."[53]

***Pre-Remand Appeal***

After Johnson's termination letter, the parties sent letters back and forth through their attorneys about the reasonableness of the Board's decision and the evidence upon which it was based. Plaintiff's counsel, Benjamin Tompkins, sent a letter to Defendant's counsel, Greyson Tuck, on October 22, 2021, addressing Johnson's termination letter. Tompkins informed Tuck

---

[52] *Id.* at 120–21.

[53] Doc. 109-6 at 80.

that the letter was not "well-taken,"[54] and provided several reasons why he believed the Bank should reverse its position. Tuck responded to Tompkins' October 22 letter in a six-page letter dated December 21, 2021, providing more detail on the specific grounds for the decision to terminate Plaintiff's benefits. Tompkins responded on February 18, 2022, in a 21-page letter to Tuck. Defendants treated this letter as the first claim for review under the ESCA's two-step review process. In an April 14, 2022 letter, Tuck wrote to Tompkins denying the first claim for review and providing more detail about the Board's reasons for its decision.

Tompkins sent a second claim review letter on June 13, 2022, which was denied in an August 11, 2022 letter. After the Board's second claim denial, Plaintiff filed this lawsuit, which eventually led to the Court's May 2024 summary-judgment ruling remanding the matter to the Plan administrator for a full and fair review.

Tuck stated in his 2021 and 2022 response letters to Tompkins that the Board conducted an internal investigation after receiving the KBI Affidavit. All three of his response letters reference the Board's review of internal documents that it claimed corroborated information it received from the KBI about Plaintiff's self-dealing and concealment of information from the Bank. For example, in Tuck's December 21, 2021 letter to Tompkins, Tuck stated that "Guaranty conducted an internal investigation into the facts and circumstances set forth in the [KBI] Affidavit."[55] After a comprehensive review of the facts upon which he claims the Board made its findings, he concluded that "[t]he results of Guaranty's investigative findings in its own records, coupled with the KBI's investigation, fully support Guaranty's decision to terminate Mr.

[54] Doc. 74 at 28.

[55] *Id.* at 36.

Crawford's benefits provided for in the ESCA."[56] He also indicated that Plaintiff's conduct breached "multiple federal and state banking laws."[57]

Similarly, in the April 14, 2022 letter, Tuck twice referred to the Board's "review of internal documents, correspondence, interviews with Guaranty employees, and information brought to light by the KBI's investigation, [where] it was discovered that during Crawford's tenure with Guaranty he had an undisclosed interest in the proceeds of loans to certain customers of Guaranty."[58]

And in his August 11, 2022 letter, Tuck stated that "Guaranty was not aware of the full scope of Crawford's involvement with Nix until the details were disclosed as a result of the KBI's investigation. Upon this discovery, Guaranty caused to be completed a thorough review of all files pertaining to Crawford, Nix, and Draper."[59]

Despite representing that the Board conducted an internal review of the Bank's documents after receiving the KBI Affidavit, the only information in the original administrative record other than the parties' letters are the KBI Affidavit, the Crawford Criminal Complaint, the Bank's Code of Conduct Policy ("COC"), Plaintiff's Post Retirement Health Insurance Benefit Plan Agreement, the ESCA, the Split Dollar Agreement,[60] and Board Meeting Minutes. There were no other documents included in the original administrative record that discussed the internal investigation referenced in Tuck's letters.

---

[56] *Id.* at 38.

[57] *Id.* at 36–37.

[58] *Id.* at 65.

[59] *Id.* at 90.

[60] The Split Dollar Agreement is a separate agreement Plaintiff entered into with the Bank that is not at issue in this matter.

***The Court's May 2024 Order***

In the Court's May 2024 Order on the parties' original summary judgment motions, it addressed several issues. On the merits, the Court found Defendants' interpretation of the forfeiture provision in the ESCA—that it allowed for a retroactive determination that grounds for cause existed at the time Plaintiff resigned—was reasonable. But the Court found procedural irregularities that rendered the termination decision arbitrary and capricious. Specifically, the Court determined that the Board ignored evidence discussed in Plaintiff's claim review letters, did not conduct a sufficient independent investigation of the underlying facts, and failed to provide Plaintiff with key documents it considered when making the adverse decision. Finally, the Court found that there was some "indicia" in the record that the Board had a conflict of interest that factored into its decision, further reducing its deference to the Board's decision. Given that the primary basis for finding that the Board's termination decision was arbitrary and capricious was procedural, the Court remanded the matter to allow the Board an opportunity to conduct a full and fair review rather than direct an award of benefits to Plaintiff.

***The Board's November 5, 2024 Meeting***

The Board held a four-hour meeting on November 5, 2024, during which it reconsidered Plaintiff's claim for benefits. At that meeting, Shoemaker, an executive officer committee member/associate director, presented to the Board a summary review of its prior decision and the investigation that gave rise to it. He told the Board members that the Board's counsel, Curt Frasier, received a phone call from the KBI in August 2020 about its investigation into the Draper feedlot and learned that Plaintiff could be a target. The Bank then expanded an already-existing investigation into the Draper feedlot to include Plaintiff's conduct. The expanded investigation included several in-person interviews with Bank officials by Tuck and his law firm.

On September 14, 2021, while Tuck's investigation was underway, the KBI released its criminal complaint and supporting affidavit. Shoemaker advised the Board at its November 2024 meeting that the KBI's complaint and affidavit were consistent with the preliminary findings from the Bank's 2021 investigation. The Board met on September 28, 2021, to hear the results of the Bank's investigation and the details of the KBI complaint, and ultimately voted to terminate Plaintiff's eligibility for benefits under the ESCA.

According to the Board minutes from November 2024, Shoemaker then recounted that the Board asked Tuck in late 2021 and early 2022 to prepare a written report of the findings of his investigation, which included interviews with several individuals and a document review. Tuck issued an internal letter to the Board on December 15, 2021, with his findings. Shoemaker reviewed that report with the Board,

> which recounted evidence of Mr. Crawford's undisclosed partnership with Mr. Nix, Mr. Crawford's efforts to conceal the elevated death count at the Draper feedlot, Mr. Crawford's instructions to Mr. Draper that Draper inform Mr. Nix of the cattle deaths before the Bank could discover those deaths, and Mr. Crawford's recommendation that Mr. Draper sell his feedlot in order to protect himself and conceal the cattle deaths.[61]

After remand, the Bank obtained the KBI's investigation file, which includes audio and video recordings of interviews conducted by KBI and FDIC agents. The file was made available to the Board through a web portal prior to the meeting. Shoemaker reviewed several of these documents with the Board at the meeting, including cattle auction invoices and copies of checks to Nix; documents pertaining to payments Plaintiff received from S&S Investments; prior correspondence between counsel for Plaintiff and counsel for the Board; the KBI Affidavit and

[61] Doc. 106-2 at 5.

criminal complaint; and the Bank's COC. Shoemaker played several recorded interview excerpts, which are included in the Administrative Record.

The Board reviewed documents related to a payment to Plaintiff of more than $11,000 from S&S Investments ("S&S"), one of Plaintiff's loan clients, following a loan to S&S from the Bank. The Board listened to or watched several interviews from the KBI files, and looked for Board or loan committee minutes that would have noted Plaintiff's conflict of interest with customers and found none. The Board members discussed several of Plaintiff's defenses to the claims alleged by the Bank in its termination letters, asked for more information when needed, and considered the new information made available from the KBI.

At this meeting, the Board also had before it Johnson's declaration, executed on November 4, 2024. He was not present during the Board meeting; he abstained from taking part in the decision on remand about Plaintiff's benefits.[62] Johnson's declaration recounts the facts giving rise to the investigation into loans issued by Plaintiff when he was at the Bank, including his relationship with Nix, of which Johnson had personal knowledge.

The Board also reviewed its COC and concluded that Plaintiff violated it in several ways. The Board determined that Plaintiff had engaged in self-dealing, fraud, and/or negligence with respect to the Draper feedlot and loans to Draper, Nix, Feiling, and S&S. The Board concluded that Plaintiff's conduct met four of the five categories of "cause" under the ESCA: (1) gross negligence or gross neglect; (2) willful violation of any law, rule, or regulation; (3) intentional failure to perform stated duties; and (4) breach of fiduciary duty. The Board unanimously approved a motion to reaffirm its original decision to terminate Plaintiff's employment for cause

[62] *Id.* at 11; Doc. 107 at REM00457.

as of the date he resigned and find that he therefore forfeited his right to benefits under the ESCA.

***Termination Letter and Appeal on Remand***

On November 20, 2024, defense counsel, Kyle Klucas, sent Tompkins the Bank's Notice of Termination of Benefits, conveying the Board's decision at the Board meeting earlier that month. In this 21-page letter, Klucas set forth the reasons for the Board's decision, identified the evidence it considered on remand, and addressed 25 arguments Plaintiff had previously presented to contest the Board's decision and reasoning. At the end of the letter, Klucas stated:

> If Mr. Crawford disputes the Board's determination, the Board requests that he voluntarily submit to an interview with counsel for the Board and provide documentation at the request of the Board in order to facilitate the Board's further evaluation of his claim. Mr. Crawford should be on notice that his failure to cooperate with any investigation by the Board may result in the Board making an adverse inference based on his non-compliance.[63]

On February 18, 2025, Tompkins sent Klucas a 50-page letter,[64] attaching 54 exhibits, that the parties agree constitutes Plaintiff's appeal under the ESCA. In this letter, Plaintiff objected that the Board's decision was not based on substantial evidence, that it did not address "'all' evidence referenced during the administrative process," that it was tainted by a conflict of interest, and that the Board failed to produce all of its investigatory materials to Plaintiff.[65] Plaintiff objected in detail to the Board's finding that there was cause to terminate him, and provided the Board with a multitude of exhibits, including two of his own declarations.

On April 3, 2025, the Board held a special meeting to consider Plaintiff's appeal. Again, Johnson abstained from the meeting. For almost three hours, the Board discussed Plaintiff's

---

[63] Doc. 106-3 at 21.

[64] Doc. 109-3. The letter includes 65 dense, substantive footnotes.

[65] *Id.* at 2–3.

appeal and exhibits, which were made available to Board members prior to the meeting. Board members considered whether Plaintiff's arguments were supported and whether they undercut the Board's prior decision. Board members asked questions and reviewed documents. Ultimately, the Board voted unanimously to deny the appeal and reaffirm its decision terminating Plaintiff's benefits. Klucas sent Plaintiff a letter on April 18, 2025, setting forth the Board's 28-page response to his appeal letter. The Board addressed Plaintiff's arguments on appeal and affirmed its decision to terminate his benefits.

## IV. Discussion

Plaintiff now challenges the Board's decision on remand to terminate his retirement benefits in three ways. First, he points to procedural flaws during the remand process. Second, he provides new arguments and evidence to support his claim of a conflict of interest. Third, Plaintiff argues that the renewed denial of benefits decision was arbitrary and capricious. In considering Plaintiff's challenges, the Court confines itself to a review of the Board's remand decision.

### A. Procedural Challenges to the Remand Decision

Plaintiff raises two overarching procedural challenges to the remand decision: (1) the Board failed to "rebut" ten categories of evidence he presented in his first administrative proceeding and in his February 2025 appeal; and (2) the Board failed to provide him with documents to which he was entitled. Defendants maintain that they complied with ERISA and its regulations.

Buried in a footnote to his opening brief, Plaintiff also asserts that the remand termination letter and the final denial letters "failed to include information required under 29 C.F.R. §

2560.503-1(g)(1)(iii)."[66] Assuming, *arguendo*, that this issue was fairly raised, the Court summarily denies it for the same reasons the Court found that the original termination decision was sufficient,[67] and proceeds to consider Plaintiff's other procedural challenges that are clearly set forth in the briefing.

Under 29 U.S.C. § 1133(2), "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." The Department of Labor's regulations under this provision require that, as part of the full and fair review, a claimant is entitled to "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits," and the claims procedure must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim."[68]

"[F]ull and fair review of a denial must include: 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'"[69] The Tenth Circuit has explained that "the concern is whether administrators rely on internal records and evidence to make benefits determinations and then

---

[66] Doc. 110 at 20 n.103.

[67] *See* Doc. 75 at 35–37; *see also Cohen v. Liberty Mut. Grp. Inc.*, 380 F. Supp. 3d 363, 385 (S.D.N.Y. 2019) (finding that termination letters did not meet ERISA regulatory requirements because they failed to provide the specific reasons for the denial).

[68] 29 C.F.R. § 2560.503-1(h)(2)(iii), (iv).

[69] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988)).

withhold those reasonings from claimants. Our caselaw and ERISA regulations proscribe this practice."[70]

### 1. The Board's Consideration of Plaintiff's Arguments and Evidence

The Court first addresses Plaintiff's claim that the Board failed to consider all of the evidence and arguments he presented in his appeal of the termination decision. He argues that the Board failed to address ten categories of evidence he presented on appeal—itself a procedural violation—and that the termination decision was therefore not based on substantial evidence.[71] Specifically, Plaintiff argues that the Board failed to consider his objections regarding: (1) the accounting method; (2) cattle inspections; (3) that the Draper feedlot cattle loss numbers were not unusual; (4) the cattle theft and criminal charges against Draper; (5) that Plaintiff was not connected to other criminal participants; (6) that he was not self-dealing; (7) GSB's knowledge of Plaintiff and Nix's relationship in 2020; (8) that Plaintiff did not earn a profit from the cattle scheme, and that GSB failed to take action against other Board members for violating the same policies; (9) that the criminal charges against him were dismissed and no other enforcement action was taken; and (10) the Board's failure to review the entire KBI file.

Under Tenth Circuit law, an ERISA "fiduciary must consider an independent ground for coverage that the claimant raises during the appeal."[72] However, "this rule applies only when the administrator has 'little or no evidence in the record to refute' the claimant's ground for

[70] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1226 n.15 (10th Cir. 2023).

[71] 29 C.F.R. § 2560.503-1(h)(2)(iii), (iv). Even if the ESCA is considered a top-hat plan, ERISA's procedural requirements still apply; thus, the Court need not resolve that issue when considering Plaintiff's procedural challenges. *See McCarthy v. Com. Grp., Inc.*, 831 F. Supp. 2d 459, 481–83 (D. Mass. 2011), *vacated on other grounds,* No. 09-CV-10161-PBS, 2012 WL 13050457 (D. Mass. Feb. 3, 2012).

[72] *Ian C.*, 87 F.4th at 1221.

recovery."[73] Thus, "[i]f an administrator's decision ignores an independent ground for coverage and there is scant evidence to refute the claimant's theory, then the decision fails arbitrary-and-capricious review."[74] At the same time, "a benefits decision can be reasonable even when the insurer receives evidence contrary to the evidence it relies on."[75] As the District of Utah has explained, "in some cases, application of these standards may pose difficult line-drawing challenges," but "[w]hat *D.K.* and *David P.* make clear is that ERISA requires something more than nothing."[76] That court ultimately determined that the insurer's decisions to credit certain medical evidence "were conclusory, wholly lacking in any analysis or explanation concerning why [the insurer] chose to discredit evidence in the record that was contrary to its determinations."[77]

The Court is mindful that the decisions cited above do not neatly apply in the context of Plaintiff's ERISA claim. Those cases almost all consider medical claims and the degree to which insurers adequately engage with treating physician opinions.[78] That is not the kind of evidence at issue here. Under the governing case law, the Board was not required to address and rebut each and every piece of evidence Plaintiff submitted on appeal.[79] Instead, the Court

---

[73] *Id.* (quoting *Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 F. App'x 568, 577 n.11 (10th Cir. 2017)); *see also Gaither v. Aetna Life Ins.*, 394 F.3d 792, 807 (10th Cir. 2004) ("[W]e assert the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory.").

[74] *Ian C.*, 87 F.4th at 1222.

[75] *Ellis v. Liberty Life Assurance Co.*, 958 F.3d 1271, 1290 (10th Cir. 2020).

[76] *G.W.-S. v. United Healthcare Ins.*, No. 2:19-CV-810-RJS-DAO, 2024 WL 3652029, at *26 (D. Utah Aug. 5, 2024).

[77] *Id.*

[78] *See, e.g.*, *Ian C.*, 87 F.4th at 1222; *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023); *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1309 (10th Cir. 2023).

[79] *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (rejecting a treating physician rule in the ERISA context because "courts have no warrant to require administrators automatically to accord special

focuses on whether the Board ignored an independent ground for coverage that Plaintiff raised in his appeal for which the Board had little or no evidence to refute. The Court has reviewed Plaintiff's arguments, his appeal letter, and the Board's final denial letter and finds that the Board engaged with and considered the materials Plaintiff presented in his appeal on each of these issues.

The Court will not belabor these issues by delving into the factual weeds of all ten issues he raised on appeal. The Board's lengthy and detailed final termination letter took on all of these arguments and thoroughly explained why the Board rejected them. For example, Plaintiff argued on appeal that he did not use the "first-in-first-out" ("FIFO") accounting method to hide the cattle because the Bank knew about this accounting method and approved it. Moreover, he claimed that the accounting method did not cause any Bank losses. It is undisputed that Plaintiff raised this issue in his appeal and that the appeal and attached exhibits were provided to the Board. The April 3 Board meeting minutes reflect that the Board considered and discussed this information. And the Board's rejection of Plaintiff's argument was explained in several paragraphs of the final denial letter.[80] It is simply not true that the Board failed to consider this basis for appeal.

On this and other issues, Plaintiff repeatedly criticizes the Board's credibility determinations. To be sure, the basis for terminating Plaintiff's benefits required the Board to determine whether Plaintiff's version of events was credible, as compared to other documentary evidence and statements made by other witnesses. But credibility determinations are "the

weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").

[80] Doc. 106-5 at 4.

province of the Plan administrator."[81] The Board sufficiently explained on several occasions why it chose not to credit Plaintiff, including in the following notable paragraph:

> Ultimately, the Board concludes that no one involved in the criminal enterprise in this matter is particularly credible, but that the objective evidence supports the existence of a scheme between these individuals. As discussed, the KBI Report corroborates the existence of the Nix arrangement, and so does Crawford's prior conduct. Crawford also frequently relies upon the testimony of some of these individuals, including his reference to Draper's statement that he did not know how bad the death losses were until the very end. Finally, at a minimum, Draper's credibility concerns should have caused Crawford to more carefully monitor the Draper Feedlot, rather than simply take the word of someone with "documented legal problems." Crawford concedes that he used the FIFO system because "he lived over 200 miles away," and could not himself check the cattle. So, Crawford decided to rely upon the word of a criminal who he now argues is not credible. He cannot have it both ways. Nearly all individuals involved in the Draper Feedlot now appear to be tainted, but the objective evidence nonetheless suggests an enterprise between them.[82]

The Court will address these credibility issues later on the merits, to the extent they form the basis of Plaintiff's substantial-evidence challenge. The Board sufficiently and directly addressed the ten categories of evidence Plaintiff identifies in his motion for summary judgment. There is no indication that the Board ignored an independent ground for coverage raised in Plaintiff's appeal.

### 2. Production of Defendants' Evidence

Plaintiff next argues that the Board did not fully and timely disclose all of the evidence that ERISA required it to disclose to him during the remand process. Specifically, Plaintiff sent an email to Defendants' counsel on November 27, 2024, seeking 29 categories of records.[83] On

[81] *Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 705 (10th Cir. 2007).

[82] Doc. 106-5 at 18–19 (quoting Doc. 109-3 at 29, 32).

[83] Doc. 109-4 at 65–67.

December 18, 2024, counsel for Defendants responded with a link to the administrative record, which "includes the documents reviewed by the Board, as well as each video and audio clip viewed by the Board during the remanded meeting (it also contains a combined copy of the video clips, for your courtesy)."[84] Defendants objected to discovery beyond the administrative record.

Plaintiff argues that Defendants "unilaterally decided what to provide Crawford and failed to provide records that Tuck previously had access to in conducting the investigation relied upon by Defendants during the first process and during the 2024–2025 remand proceedings."[85] Defendants argue that Plaintiff refused to cooperate in the Board's investigation and that Plaintiff in fact had access to several of the documents he claims Defendants failed to produce to him. In his motion, Plaintiff fails to specify which of the 29 categories of evidence he sought that were not produced by Defendants other than the documents he claims were part of Tuck's 2021 internal investigation.

The Court is guided by the language of the governing regulation, which provides that the Board must provide Plaintiff with "reasonable access to, and copies of, all documents, records, and other information *relevant to* the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section."[86] Paragraph (m)(8) in turn provides that a document is relevant to a claim if it:

> (i) Was relied upon in making the benefit determination;
>
> (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such

---

[84] *Id.* at 70; *see Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1157–62 (10th Cir. 2010) (explaining limited exceptions to the general rule that federal courts' arbitrary-and-capricious review of an administrator's decision is limited to the administrative record).

[85] Doc. 110 at 31.

[86] 29 C.F.R. § 2560.503-1(h)(2)(iii) (emphasis added).

> document, record, or other information was relied upon in making the benefit determination; [or]
>
> (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination . . . .[87]

As the emails make clear, within one month of his request, Defendants provided Plaintiff with a link to the administrative record, which they represented included all of the documents, records, and other information relevant to Plaintiff's claim for benefits, as defined by the regulation. In his motion, Plaintiff focuses only on the 2021 internal investigation and the underlying documents he contends the Board did not make available to him. Recall that the Court previously found a procedural irregularity under ERISA because the Board referenced this internal investigation in its original claim denial letters, but the administrative record did not include any documents, reports, or results generated by this internal investigation. The Court remanded in large part because it found that the Board relied on this internal investigation in terminating Plaintiff's benefits under the ESCA without making any information about that internal investigation available to him, nor did Defendants include that information in the original administrative record.

Plaintiff again cries foul based on the lack of underlying documents from that internal investigation. The Court must now evaluate how that internal investigation contributed to the Board's decision on remand, and whether it fulfilled its disclosure obligations during the remand process. Unlike the original proceeding, the Court finds that the Board fulfilled its obligations to disclose documents and materials to Plaintiff that it relied on in making its decision on remand,

[87] 29 C.F.R. § 2560.503-1(m)(8).

thereby providing Plaintiff with sufficient information to appeal and challenge the Board's decision and the information it relied on.

The Board meeting minutes from November 2024, along with the denial letters, demonstrate compliance. During the Board's four-hour meeting on November 5, 2024, Shoemaker presented a review of the Board's prior decision and the investigation that gave rise to it. He told the Board members that, after Frasier received a phone call from the KBI in August 2020 about its investigation into the Draper feedlot and informed him that Plaintiff could be a target, the Bank expanded an already-existing investigation into the Draper feedlot to include Plaintiff's conduct. That investigation included several in-person interviews with Bank officials by Tuck and his law firm. The Board maintains that there were no notes or documents generated by this investigation that are discoverable.

On September 14, 2021, while Tuck's investigation was underway, the KBI released its criminal complaint and supporting affidavit, which Shoemaker advised the Board at its November 2024 meeting was consistent with the preliminary findings from the Bank's 2021 investigation. Shoemaker then recounted that the Board asked Tuck in late 2021 and early 2022 to prepare a written report of the findings of his investigation, which included interviews with several individuals and a document review. Tuck issued an internal letter to the Board on December 15, 2021 with his findings.[88] Shoemaker reviewed that report with the Board, and it was provided to Plaintiff as part of the administrative record on remand.

Contrary to Plaintiff's assertions, Johnson's November 4, 2024 declaration does not indicate that investigatory materials exist that have not been produced. And importantly, none of

[88] *See* Docs. 110 at 5, 24, 31 (acknowledging the letter was produced to Plaintiff on remand); 109-3 at 5; 106-5 at 14.

Plaintiff's citations indicate that the Board on remand had other documents before it that it relied on in making its termination decision that were not produced to Plaintiff. Instead, Johnson's statements corroborate the information Shoemaker presented to the Board at the meeting. Specifically, Johnson stated that the Bank received information from the KBI in August 2020, alerting it to Plaintiff's partnership with Draper and Nix, which prompted "an investigation into the loans issued by Crawford while at the Bank, with special focus on the Feedlots and his relationship with Nix. . . . [W]e continued to interview Bank employees and review the loan files of Crawford for evidence relating to our suspicion that he had engaged in self-dealing."[89]

The Board explained its investigation in detail to Plaintiff in the final denial letter. It explained that it asked Tuck to investigate and review Crawford's loan file in September 2020, but that Tuck, Johnson, Frasier, and Shoemaker did not discuss the scope of the investigation until February 19, 2021, and the actual investigation began one month later. Between that date and August 2021, Tuck reviewed the files and held teleconferences with Johnson and Frasier to discuss options. After the September 14, 2021 KBI Affidavit was provided to the Bank, the Bank believed it confirmed its suspicions about Plaintiff's self-dealing, and soon after the Board decided to terminate Plaintiff's benefits. After Plaintiff appealed that original denial, the Bank more fully investigated. As the Board explained in its final denial letter:

> In November and December, 2021, in part to investigate the allegations made in your letters contesting the forfeiture of Crawford's benefits, Tuck traveled to Kansas to review file materials, including loan histories, payments, collateral inspections, initial interviews with Guaranty employees, account histories, internal memos, and other information related to Crawford and the Nix/Draper matter. While these interviews did not result in any written notes, the Board declined to divulge any further matter regarding this investigation because it occurred after

[89] Doc. 107 at 457 ¶ 15.

> you threatened litigation on October 21, 2021, and is thereby privileged.[90]

In sum, there is no evidence that any underlying documents from Tuck's 2021 investigation were before the Board when it made the decision in November 2024 to terminate Plaintiff's benefits. To be sure, the December 2021 letter was before it, as was Shoemaker's summary of how the investigation proceeded at that time. But Plaintiff had and has access to the many documents and materials that were in fact before the Board on remand—much more information than it considered in the first instance. And the benefit denial letters explain in detail how the Board used that information in reaching its decision. That is what the ERISA regulations require.

Plaintiff relies on *Martinez v. Miami Children's Health System, Inc.*[91] to argue that Tuck's internal investigation was not impartial because he was hired to defend the Bank and not to independently determine whether Plaintiff had engaged in self-dealing. In *Martinez*, the district court concluded that the plan administrator failed to conduct a full and fair review during the adjudication process.[92] There, the plaintiff had applied for severance under a policy governed by ERISA, challenging his employer's determination that he had been terminated for cause. The plan administrator retained outside counsel to review the plaintiff's claim. Outside counsel conducted an internal investigation and helped the plan administrator draft letters denying the plaintiff's claim. After reviewing the evidence, the court concluded that the plan administrator predetermined the outcome of the claim and hired outside counsel in order to

---

[90] Doc. 106-5 at 14.

[91] 674 F. Supp. 3d 1256, 1266 (S.D. Fla. 2023).

[92] *Id.* at 1272.

defend that decision.[93] Although the court acknowledged that "hiring an independent, impartial adjudicator could be an effective way 'to reduce potential bias and to promote accuracy' of a claim adjudication," in that case, the law firm was hired in anticipation of litigation, and then the plan administrator simply rubber stamped its conclusions.[94] The court remanded the case to the plan administrator for a full and fair review.[95]

*Martinez* does not compel a similar result here. Unlike in *Martinez*, this case is before the Court after a remand to conduct a full and fair review. And, unlike *Martinez*, the Board on remand did not hire an outside law firm to investigate whether Plaintiff's ESCA benefits should be terminated and then rubber stamp its conclusions. On remand, the Board provided Tuck's report from the original proceeding to Plaintiff and based its remand decision on a more complete record than it had during the original proceeding, including the KBI investigative file. The Court finds no procedural irregularity based on Defendants' purported failure to produce documents that were neither before the Board when it made its 2024 termination decision nor generated during that process.[96]

Finally, Plaintiff takes issue with the Board's reliance on the Koenigsman and S&S loans, which he claims it produced no records to support. But again, Plaintiff provides no basis for concluding that any additional records were generated or considered by the Board on these loans that were not produced to him. As to the Koenigsman loan, the circumstances surrounding this are discussed in Johnson's declaration, which is part of the administrative record. The appeal

---

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *See Felker v. USW Loc. 10-901*, No. CV 13-7101, 2016 WL 3198615, at *13 (E.D. Pa. June 9, 2016) ("There is no evidence that the Plan Administrator simply rubber-stamped legal counsels' interpretation of the Plan, and his choice to consult counsel during the process of drafting a response to Plaintiffs' letter was not inappropriate."), *aff'd*, 697 F. App'x 746 (3d Cir. 2017).

letter references the Bank's awareness of Plaintiff's previous engagement with Koenigsman where Johnson and Frasier determined that Plaintiff had violated bank policy concerning conflicts of interest and removed Plaintiff as a loan officer. Johnson stated that he believed the issue had been dealt with. On the S&S loan, Defendants explain in their response brief that "as counsel was preparing its Motion, it discovered that the S&S Check had not been included in the administrative record, though it was discussed extensively by the Board."[97] Counsel then immediately provided Plaintiff with a copy, which had been endorsed and deposited by Plaintiff himself, but had been inadvertently excluded from the administrative record.[98] The Court is satisfied that Plaintiff has been provided with the information considered and/or generated by the Board.

In conclusion, the Court does not find any procedural deficiencies with the Board's remand proceedings that would decrease the amount of deference it applies under the arbitrary-and-capricious standard of review. The Board provided Plaintiff with a full and fair review of the decision by carefully considering his appeal and by providing him with the documents and materials that were relevant to its decision.

**B. Conflict of Interest**

As with the original proceeding, Plaintiff argues that the Board had a conflict of interest that should reduce the Court's deference to its decision on remand to terminate his retirement benefits. An inherent conflict of interest in the ERISA context exists when the plan administrator "both determines whether an employee is eligible for benefits and pays benefits out

[97] Doc. 115 at 44.

[98] As Defendants point out, the check was deposited by Plaintiff, so at some point, he had possession of the document. *See* Doc. 115-5.

of its own pocket."[99] Because here the Board both determined whether Plaintiff was eligible for benefits and pays those benefits out, there is an inherent conflict of interest. In the original proceeding, Plaintiff claimed that the Board had an incentive not to terminate his benefits until after the covenant not to compete under the ESCA expired in April 2021, and at that point, shift the blame for the cattle deaths and bank losses to Plaintiff.

Plaintiff does not accurately recite the Court's original conflict-of-interest ruling. The Court did not conclusively determine that the Board's inherent conflict of interest played a role in its decision, as Plaintiff baldly asserts throughout his administrative appeal and summary-judgment briefs. It found no evidence that there was a "generic" financial conflict of interest because the Bank had already set aside the funds required under the ESCA.[100] The Court did find that there were some "circumstances in this case that suggest a conflict of interest played at least some role in the Board's decision."[101] Namely, there was evidence that suggested the Bank was aware of Plaintiff's self-dealing prior to its decision to terminate his benefits. Specifically, Plaintiff told investigators that "Johnson, the president of GSB, was fully aware of" his arrangement with Nix, whereby he would receive a percentage of the profit or loss incurred on cattle that Nix was feeding, and Johnson allowed it to continue.[102] However, the Court's ability to assess these circumstances was limited by the slim administrative record provided in the

---

[99] *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 108 (2008).

[100] Doc. 75 at 43.

[101] *Id.* Plaintiff also misrepresents that the Court issued a "directive that [the Board] 'wall off claims administrators from those interested in firm finances or impose management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits.'" Doc. 116 at 47 (quoting Doc. 75 at 43). The Court's language came from the Supreme Court's *Glenn* decision. *See* 554 U.S. 105, 117 (2008). This Court explained that there was no evidence in the record about either end of the spectrum discussed in *Glenn*—there was no evidence that the Board had a history of making biased decisions and there was no evidence that it walled off the claims administrators from those in finance. Instead, the Court discussed other case-specific circumstances that gave rise to an inference that the conflict played a role. Doc. 75 at 42–45.

[102] Doc. 107 at REM00068.

original proceeding. The Court could not determine the extent of any conflict due to the lack of evidence about the Bank's internal investigation. Accordingly, the Court reduced its deference to the plan administrator's decision. The combination of this reduced deference and procedural irregularities compelled the Court to remand to the Board for a full and fair review.

On remand, Plaintiff again asserts that the Court should reduce its deference to the Board's decision due to its conflict of interest, this time pointing to (1) an insurance claim that the Bank filed based on Plaintiff's misconduct; (2) Defendants' recoupment counterclaims; (3) evidence that he claims suggests Tuck had drafted the termination decision before the Board received the KBI Affidavit in 2021, waiting until Plaintiff's non-competition agreement expired before making the termination decision; and (4) that Johnson and other Bank officials had personal issues with Plaintiff or incentives to divert attention from their own conduct, which weighed into the Board's decision. Defendants respond that none of these arguments demonstrate a conflict of interest that should cause the Court to reduce its deference to the Board's decision. The Court agrees.

As this Court has already acknowledged, a plan administrator's conflict of interest is "one factor among many that a reviewing judge must take into account" when reviewing the decision under the arbitrary-and-capricious standard of review.[103] As the Seventh Circuit has explained, under *Glenn*, "[i]t is . . . not the existence of a conflict of interest—which is a given in almost all ERISA cases—but the gravity of the conflict, as inferred from the circumstances, that is critical."[104] Under the combination-of-factors approach required by *Glenn*, the Court will give more weight to a conflict "where circumstances suggest a higher likelihood that it affected the

[103] *Glenn*, 554 U.S. at 116.

[104] *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009).

benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."[105] However, the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."[106] The Court should take into account several considerations, "often case-specific," and reach a determination by weighing them together.[107] When evaluating whether the plan administrator's decision is arbitrary and capricious, a conflict of interest can act as "a tiebreaker when the other factors are closely balanced."[108]

On remand, there is still no evidence that the Board has a history of biased decision-making in its role as plan administrator. And, this time, Johnson recused himself from the decision-making process altogether. He submitted a declaration to the Board about the facts of which he had personal knowledge, but otherwise did not take part in the Board meetings on remand. Plaintiff asserts that the Board should have hired a neutral expert to evaluate the decision, "such as a medical or accounting professional in other cases."[109] But *Glenn* does not mandate this as a way to show "active steps to reduce potential bias and to promote accuracy."[110] Moreover, this is an ERISA plan with a single beneficiary, and the Board had been delegated discretionary authority to interpret the Plan, including the forfeiture provision. The Court credits the Board's decision to wall off Johnson from the remand deliberations given Plaintiff's repeated arguments that Johnson's personal bias and history with Plaintiff caused the Board to operate under a conflict of interest.

---

[105] *Glenn*, 554 U.S. at 117.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] Doc. 118 at 4.

[110] *Glenn*, 554 U.S. at 117.

The Board took other steps to ensure accuracy. First, it hired outside counsel to investigate the Draper feedlot loans when it was notified by the KBI that Plaintiff was a target of the investigation. Although outside counsel eventually pivoted to defending the Board's decision after the original termination was made, prior to September 2021, it was tasked with a general investigation into the facts because the KBI would not provide the Bank with further information. On remand, the Board obtained the entire KBI file and reviewed several witness interviews and documents that were compiled by that agency. And the Board held two separate robust meetings, during which it heard much more evidence than when it made its original decision and asked questions, before making decisions. The Court credits the Board's decision to take these steps to reduce bias and promote accuracy.

Plaintiff continues to complain of bias from Johnson and others, and points to other evidence that he claims supports the need to give great weight to the Board's conflict of interest. The Court considers these case-specific circumstances based on a more robust remand record and, as explained below, concludes that they do not demonstrate that the conflict of interest played a meaningful role in the Board's decision-making process.[111]

### 1. Insurance Claim and Recoupment Counterclaims

First, Plaintiff points to evidence that Tuck assisted the Bank in making an insurance claim related to Plaintiff's conduct. Indeed, in Tuck's internal letter to the Board on December 15, 2021, he indicated that the Board "beg[an] the process of making a claim on the Bank's fidelity insurance bond policy to recover the losses due to Crawford's conduct."[112] But, as the

[111] As discussed in the Court's reasonableness review, the other factors in this case are not closely balanced. Therefore, even if the conflict of interest weighed more heavily into the Court's decision, it would not act as a tiebreaker, nor change the Court's conclusion that the plan administrator's decision was not arbitrary and capricious.

[112] Doc. 107 at REM00104.

Board explained in its final denial letter, the insurance claim was dropped, and the Board performed a new review on remand with additional evidence, reaching the same conclusion. The Court agrees with Defendants that the insurance claim does not demonstrate a conflict of interest that should be given weight in the Court's review of the Board's remand decision. Given that no claim was pending, it is unclear how the initial filing of a dropped insurance claim demonstrates a conflict of interest on remand.

Plaintiff also suggests that Defendants' recoupment counterclaims in this action demonstrate a likelihood that the conflict weighed into the decision. The Court easily disposes of this argument. There were no counterclaims in existence at the time the Board originally decided to terminate Plaintiff's benefits. And the recoupment counterclaims only proceed if Plaintiff succeeds on the ERISA claim at issue on these motions.[113] The point of recoupment is "to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract."[114] The filing of these counterclaims alone does not demonstrate a conflict, much less one that impacted the Board's decision on remand. They are entirely consistent with Defendants' position on Plaintiff's ERISA claim.

### 2. Timing of the Board's Original Decision

[113] *See* Doc. 97 ¶¶ 69, 76, 81, 87, 98 (limiting prayer for relief to no more than the amount sought in the Amended Complaint); Doc. 96 at 6 ("For Phase I, the parties agree all discovery on Defendants' counterclaims will continue to be stayed pending a resolution of Plaintiff's ERISA claim. If the Plaintiff prevails on his ERISA claim, no later than 14 days after such ruling, the parties will confer and submit a proposed schedule regarding discovery as to Defendants' counterclaims.").

[114] *Waechter v. Amoco Prod. Co.*, 537 P.2d 228, 254–55 (Kan. 1975) (quoting 20 Am. Jur. 2d Counterclaim, Recoupment § 1).

Plaintiff next relies on the timeline discussed by the Court in its May 2024 Order and argues that the remand decision was tainted by the same circumstances that concerned the Court in the original proceeding—evidence that the Bank knew about Plaintiff's self-dealing long before it terminated his benefits, yet did not terminate Plaintiff for cause and waited more than one year after his resignation to terminate his benefits. Plaintiff argues on remand that the conflict of interest caused the Board to wait until Plaintiff's non-competition clause expired before providing him with notice that it was terminating his benefits. Plaintiff maintains that the Bank was incentivized to wait until the restrictive covenant term passed in order to avoid losing out on loans that were previously managed by Plaintiff.

In its last Order, the Court was concerned about the scope and conclusions of the Bank's internal investigation, for which no evidence was provided in the original administrative record. The record at that time did not make clear to what degree the Bank was aware of Plaintiff's self-dealing on the Draper feedlot loans when it learned about the KBI's investigation and decision to charge Plaintiff, why the Bank did not terminate Plaintiff for cause, when the internal investigation began, and on what information it was based. These holes in the record have been addressed on remand.

On remand, the Board produced information about the internal investigation referenced in Tuck's letters to Tompkins during the original administrative proceedings. It also produced evidence that clarifies the timeline and scope of its knowledge of Plaintiff's conduct that gave rise to the termination decision. Shoemaker told the Board on remand that the Bank became aware of a KBI investigation into activities at the Draper feedlot in 2019, but the KBI did not disclose that it was investigating Plaintiff at that time. The Bank retained Tuck to begin a "broad

internal investigation into activities at the feedlot . . . to review Bank policies and procedures," and "the Draper feedlot records."[115]

The Bank first learned that Plaintiff could be a target of the investigation when the KBI contacted Frasier on August 28, 2020. Johnson's affidavit establishes that the Bank also received a Federal Bureau of Investigation ("FBI") subpoena relating to a separate matter involving S&S around that time. The Bank then expanded its broader investigation to focus on Plaintiff's conduct. Shoemaker told the Board in November 2024 that the Bank's suspicions about Plaintiff and his partnership with Nix and the Draper feedlot were not confirmed until it received the KBI Affidavit on September 14, 2021. Prior to this time, according to Board members who commented at the meeting, the Bank had been willing to give Plaintiff the benefit of the doubt.

The final denial letter also addressed Plaintiff's evidence calling the Board's timing into question. It addressed Exhibit 11 to Plaintiff's appeal letter, which was a KBI Affidavit dated December 20, 2020.[116] The letter states that the Board did not receive this affidavit; the Bank did not receive any version of the KBI Affidavit until September 14, 2021. The Board also listened to an excerpt of Plaintiff's second interview with the KBI, during which he claimed Johnson knew about his self-dealing at the feedlots prior to 2020. But the Board disagreed with Plaintiff's characterization of that interview because Plaintiff merely stated that he "would have" told Johnson about his partnership with Nix, not that he did tell him. Johnson's sworn declaration denies that Plaintiff told him this information. The final letter makes clear that although Frasier, Johnson, and King suspected Plaintiff's involvement in cattle deaths at the

---

[115] Doc. 106-2 at 4.

[116] Doc. 109-6 at 12–28.

Draper feedlot prior to August 2020, the results of the KBI investigation were confidential prior to September 14, 2021, Plaintiff had already retired, and the Bank was still not sure of the extent of Plaintiff's involvement. This is a credibility determination that was well within the Board's discretion to make.

Plaintiff points to Tuck's August 25, 2021 informal call with Johnson, Frasier, and Shoemaker, during which he told them that he had discovered evidence of Plaintiff's fraud. He suggests that they determined at that time, before receiving the KBI Affidavit, to terminate Plaintiff's ESCA benefits. Defendants maintain that they did not act to terminate benefits until they received the KBI Affidavit, which confirmed Tuck's preliminary investigation. Their actions corroborate this—they did not take any action under the ESCA until they received the KBI Affidavit, which led to criminal charges. They maintain that during the August 25 call, Tuck reviewed information he had discovered in Plaintiff's loan files, and they discussed several "options for handling what they believed to be at least some strong evidence of Crawford's self-dealing with Nix. One such option was the termination of his benefits, though no official determination was made."[117]

Plaintiff argues that Defendants' termination letters have relied on shifting rationales, suggesting a conflict of interest played a role. But the Court again finds that this concern in the original proceeding has been addressed on remand. The remand denial letters are consistent with the original denial letter. They all focus on the four grounds for cause that were identified in that original letter. Although the later letters provided on remand are more robust and address the Board's additional proceedings on remand, the basis for the decision on remand did not change.

[117] Doc. 106-5 at 13.

Finally, the Court finds no evidence that Plaintiff's non-competition clause played a role in the Board's decision. King and Shoemaker told the Board that Plaintiff's non-compete clause was never discussed during the original investigation. And, notably, the one-year non-compete clause in Plaintiff's employment contract expired six months before the Board issued its termination decision. There is no evidence that the Board was concerned that Plaintiff would attempt to compete with the Bank when the clause expired, and there is no indication that Plaintiff made any attempt to do so during the six months between the clause's expiration and the Board's decision. If this motivated the Board, the Court would have expected it to have acted much sooner.

**3. Biased Decisionmakers**

Plaintiff argues that Johnson and other Bank officials, including King and Shoemaker, held a personal bias against him and were motivated by either the Bank's interest in not paying him his retirement benefits or their own personal interests in detracting from their own roles in the Draper feedlot losses.

First, to the extent Plaintiff is able to show that Johnson had some personal bias toward Plaintiff that impacted the Board's objectivity, Defendants eliminated that concern by having him recuse from the decision-making process on remand. He was not present during the Board meetings to discuss the original remand decision or to decide Plaintiff's appeal. Plaintiff maintains that Johnson's recusal was not sufficient to eliminate his bias, given that he led the Bank for 50 years. The Court is not persuaded that (a) Johnson had a personal bias against Plaintiff that was so entrenched it played a role despite his recusal, or (b) any such bias could be attributed to the rest of the Board. There is simply no evidence in the record to support this.

Second, Plaintiff urges that King and Shoemaker were biased in their presentation of evidence and information to the Board in November 2024 and April 2025. He argues that they had a motive to blame Plaintiff, and not the Bank or King, who took over the Draper feedlot loans in 2018. And Plaintiff asserts that King failed to play an excerpt of his interview with agents in July 2020 showing that he had suspicions about Plaintiff's prior conduct. The Board asked King about this during the April Board meeting:

> Mr. King explained that, at this time, the KBI's investigation was focused on potential wrongdoing by the Bank. The Board listened to an excerpt from this recorded telephone call between Mr. King and Agent Brock in July 2020. Mr. King reaffirmed that he only had unsubstantiated suspicions about Mr. Crawford at that time based on anecdotal evidence, including his conduct with respect to the Koenigsman loan. He said that he mentioned these suspicions to Mr. Johnson but told Johnson that he had no evidence to support them. Mr. Johnson had asked Mr. Crawford about any ongoing partnerships when Crawford was confronted with the Koenigsman self-dealing, and Mr. Crawford assured Johnson that he was not involved in any such arrangements.
>
> Mr. King, Mr. Shoemaker, and Mr. Frasier told the Board that the Bank was not aware at that time that Mr. Crawford had a partnership arrangement with Mr. Nix on cattle at the feedlots.[118]

Again, this goes to a credibility determination as between Plaintiff and Bank officials. It was reasonable and within the Board's discretion to credit King, Shoemaker, Frasier, and Johnson, and not Plaintiff.

In sum, the Court does not find that the Board's inherent conflict of interest impacted its decision to terminate Plaintiff's benefits. There is no history of biased decision-making, the Board took steps to eliminate any potential conflict posed by Johnson by recusing him from taking part in the decision on remand, and there are no other case-specific circumstances that

---

[118] Doc. 107 at REM00481.

suggest the conflict played a role in the Board's decision, made after a lengthy record on remand was developed and after eight hours of Board meetings to discuss and examine the evidence.

### C. Review of the Remand Decision

Having determined that Plaintiff received a full and fair review of his claim and that the Board's conflict of interest does not reduce this Court's deference to the decision on remand, the Court proceeds to review the merits of that decision under the arbitrary-and-capricious standard by considering whether it was reasonable and supported by substantial evidence.[119]

Recall that under the ESCA's forfeiture provision, the Board can terminate Plaintiff's benefits if it determines that "grounds 'for cause' exist[ed] at the time [Plaintiff's] employment terminates for any reason."[120] "For cause" under the ESCA is defined as:

> any of the following that may have an adverse effect on the Bank: (i) gross negligence or gross neglect; (ii) the commission of a felony or gross misdemeanor involving moral turpitude, fraud, or dishonesty; (iii) the willful violation of any law, rule, or regulation (other than a traffic violation or similar offense); (iv) an intentional failure to perform stated duties; or (v) a breach of fiduciary duty involving personal profit.[121]

In its decision on remand, the Board notified Plaintiff that it determined four of the five categories of cause under the ESCA applied to him: (1) gross negligence or gross neglect; (2) willful violation of any law, rule, or regulation; (3) intentional failure to perform stated duties; and (4) breach of fiduciary duty. It outlined multiple examples under each of these four categories.

---

[119] *See D.K. v. United Behavioral Health*, 67 F.4th 1224, 1235 (10th Cir. 2023).

[120] Doc. 107 at REM00005. Plaintiff "still objects to the allowance of a retroactive termination based upon cause that may have existed at the time of his voluntary resignation in April 2020." Doc. 110 at 35. The Court has already ruled that the Board's interpretation of the ESCA forfeiture provision as allowing a retroactive "for cause" determination was reasonable and declines to reconsider that ruling. *See* Doc. 75 at 31–37.

[121] Doc. 107 at REM00005.

Plaintiff challenges all of the grounds upon which the Board relied to find that cause existed to terminate him at the time of his resignation. But many of Plaintiff's arguments misconstrue or misapply the arbitrary-and-capricious standard of review that binds the Court, as explained in more detail below. The administrator does not have an affirmative duty to rebut each and every argument and piece of evidence in Plaintiff's lengthy and footnote-dense appeal, nor was it required to provide a response to each and every exhibit he submitted to challenge its decision. Instead, the Court must uphold the administrator's decision if one of the many stated reasons for terminating his benefits was reasonable and based on substantial evidence.[122]

**1. Reasonableness**

Plaintiff first argues that the Board did not reasonably find that grounds for cause existed under the four categories discussed above. Reasonableness review "considers if [the decision] (1) 'was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.'"[123] "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one."[124] Rather, courts ask only "whether the administrator's decision resides 'somewhere on a continuum of reasonableness—even if on the low end.'"[125] "Consequently, the Tenth Circuit has observed that the arbitrary and capricious standard 'is a difficult one for a claimant to overcome.'"[126]

[122] *See D.K.*, 67 F4th at 1235.

[123] *Id.* at 1236 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co*., 491 F.3d 1180, 1193 (10th Cir. 2007), *overruled on other grounds by Metro. Life Ins. v. Glenn*, 554 U.S. 105, 111 (2008)).

[124] *Adamson v. Unum Life Ins. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

[125] *Id.* (quoting *Kimber v. Thiokol Corp*., 196 F.3d 1092, 1098 (10th Cir. 1999)).

[126] *Berges v. Standard Ins.*, 704 F. Supp. 2d 1149, 1174 (D. Kan. 2010) (quoting *Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002)).

Plaintiff challenges the reasonableness of the Board's decision as to each of the four categories of cause that it found applied. The Court addresses each category in turn.

**a. Gross Negligence and Gross Neglect**

Plaintiff argues that the Board's conclusion that he was grossly negligent or engaged in gross neglect was not reasonable because Defendants failed to legally define those terms in the ESCA under Kansas law. Plaintiff maintains that gross negligence required the Board to find that he engaged in wanton conduct, and there is no evidence that Plaintiff believed his actions would injure the Bank or that he was indifferent to the risk of injury to the Bank. Defendants do not dispute that both gross negligence and gross neglect require wanton conduct, and argue that Plaintiff's conduct was wanton.

"Kansas law . . . does not recognize degrees of negligence," but "'gross negligence' is generally considered synonymous with 'wanton conduct.'"[127] Kansas law describes a wanton act as "something more than ordinary negligence, and yet . . . something less than willful injury; to constitute wantonness, the act must indicate a realization of imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the wrongful act."[128] The Board concluded that Plaintiff met this standard, at a minimum, when he became aware of the problems at the Draper feedlot but failed to inform the Bank. It also found that Plaintiff met this standard by using an improper accounting and tracking procedure for cattle at the Draper feedlot that was designed to hide the Nix and Feiling cattle losses. By the time the new loan officers took over, they were unable to determine the exact number and ownership of the cattle so that the Bank could protect its security interests. This interpretation was reasonable.

[127] *Butler Mfg. Co. v. Americold Corp.*, 835 F. Supp. 1274, 1276 n.2 (D. Kan. 1993).

[128] *Muhn v. Schell*, 413 P.2d 997, 1000 (Kan. 1966).

As the Court has already found, it was the result of a reasoned and principled process, it is reasonable in light of external standards, i.e., accepted methods of accounting, and it is consistent with the purpose of the plan, which is to prevent Plaintiff from receiving the benefits thereunder if he engaged in specified activities that would have an adverse effect on the Bank.

**b. Willful Violation of a Law, Rule, or Regulation**

Next, Plaintiff challenges the Board's determination that his relationships with Nix, Draper, and Feiling, as well as his conduct at the Draper feedlot, constituted violations of the Bank's COC. First, Plaintiff argues that the Board failed to explain how the COC is a "law, rule, or regulation" as contemplated by the ESCA. Second, Plaintiff argues that the Board did not explain how the violations were willful. Third, Plaintiff urges that members of the Board violated their own obligations under the COC by engaging in self-dealing and failing to disclose personal interests in Bank business. Fourth, and finally, Plaintiff argues that the Board failed to consider the entire record when concluding that Plaintiff lied about informing Johnson about the Draper feedlot arrangement.

The Court easily finds that it was reasonable for the Board to conclude that the COC contains "rules" as contemplated by the forfeiture provision of the ESCA. It is a code that applies by its terms to all Bank employees. At its April meeting, the Board heard from Shoemaker, who pointed out that Plaintiff was present for several past Board meetings where the COC was discussed. And in the interview excerpt from the KBI, Plaintiff acknowledges the prohibition on self-dealing. Moreover, Johnson's affidavit establishes that Plaintiff had a prior issue with violating the self-dealing prohibition and had been admonished.

It was also reasonable for the Board to find that Plaintiff's conduct was willful. The Board determined, based on the KBI Affidavit and other evidence in the record, that Plaintiff had

a partnership with Nix that he failed to disclose to the Bank despite knowing that the arrangement was a violation of the prohibition on self-dealing. The Board also determined that Plaintiff advised Draper to sell his feedlot before the Bank learned about the cattle losses. The Board's finding, which is clearly set forth in its remand letters, was that Plaintiff acted willfully. In fact, in the first remand termination letter, the Board responded to this argument as follows:

> [T]o ensure that there is absolutely no confusion, the Board provides the following brief restatement of its conclusions: Crawford was the loan officer for Nix and Draper when he entered into an under-the-table agreement with Nix to co-own or take some other financial self-interest in Nix's cattle, which were largely stored and fed at the Feedlots. Crawford never disclosed this arrangement to the Bank and took active steps to conceal it, including falsifying records. Draper was aware of this arrangement and benefited from it by having the Nix/Crawford cattle at his feedlot. When the cattle at the Draper feedlot began to die, Crawford took more active steps to conceal this fact from the Bank, including telling Draper that the Bank was coming out for inspections, telling Draper to sell the feedlot, and mixing other cattle with the Nix/Crawford cattle. This ultimately resulted in a financial loss of over $2 million to the Bank, not to mention the financial and reputational damage caused by Mark Feiling's lawsuit based on the same misconduct. The Board has concluded that these actions fit within the definition of "cause" under Section V(E) of the ESCA . . . .[129]

The Board clearly explained to Plaintiff that it found his conduct was willful. This was a reasonable conclusion based on its factual determinations.

Plaintiff argues that the Board failed to enforce the COC prohibitions on self-dealing and lack of candor against other Board members and Bank employees, making its enforcement against him unreasonable.[130] But such evidence would only be pertinent to this Court's review if

[129] Doc. 106-3 at 15.

[130] Plaintiff also argues, citing no authority, that the Board could not base its finding of cause on COC violations unless it complied with its own obligations under the COC, and then asserts that it violated the COC by failing to use an independent auditor to review its own compliance. Doc. 116 at 32. Even if there was some authority for this assertion, Plaintiff misstates the COC. It does not require the Board to use an independent auditor in order for it to "take action" when a violation is suspected. It simply provides that "[i]nternal controls against self-

it shows that the Board's interpretation of the Plan was inconsistent with any prior interpretations or is unreasonable in light of any external standards. There is no evidence that the ESCA applied to any of the individuals Plaintiff discusses. This case is not about whether the Board consistently applied the terms of the COC to Bank officials; it is about whether the Board reasonably applied the terms of the ESCA to Plaintiff. And even if the Board's COC enforcement outside of the Plan context was relevant, the Board considered the comparators identified in Plaintiff's appeal letter and determined that they are distinguishable. These conclusions were reasonable.

Finally, Plaintiff again maintains that the Board failed to consider the entire KBI file when making its decision, instead relying on King and Shoemaker's summary of the evidence and excerpts from the video and audio interviews. As discussed in the next section, the Court finds that the Board's factual findings were based on substantial evidence in the record. And as discussed in the previous section, the Court finds that Plaintiff's claim was subject to a full and fair review. The final denial letter makes clear that "[a] month prior to [the November 5, 2024 meeting], the Board was provided with the KBI files . . . via the Board's web-portal."[131] At the meeting itself, Shoemaker and King presented the excerpts of recorded interviews included in the Administrative Record. The Court does not find that Shoemaker and King withheld evidence contained in the KBI file from the Board.

In sum, the Court finds that the Board's conclusion that Plaintiff could have been terminated for cause due to his willful violation of the COC was reasonable.[132]

---

serving practices and conflicts of interest should be monitored with an effective audit program to identify operational weaknesses and to ensure corrective action and compliance with laws, regulations and internal policies." Doc. 107 at REM00018.

[131] Doc. 106-5 at 11.

[132] In the termination letter on remand, the Board also cited Plaintiff's willful violation of the law based on the Logan County charges that were eventually dismissed. On summary judgment, the Board does not press this

**c. Breach of Fiduciary Duty**

Another type of for-cause termination that can forfeit Plaintiff's benefits under the ESCA is a breach of fiduciary duty involving personal profit. Plaintiff challenges the Board's findings that he breached a fiduciary duty to the Bank, and that any breach involved personal profit. He suggests that the Board failed to identify the specific fiduciary duties he owed to the Bank in his roles as loan officer and customer service representative.

Defendants identify two sources of Plaintiff's fiduciary duty to the Bank: (1) the COC; and (2) his close relationships with Bank customers on behalf of the Bank. Under Kansas law:

> A fiduciary duty arises when one party is in a position of peculiar confidence that allows the person to have and exercise influence over another. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary. Stated another way, a fiduciary duty may exist under a variety of circumstances and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.
>
> Such a relationship can arise in two ways: as a matter of law and as a question of fact when implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. [133]

The Court finds that the Board reasonably interpreted and applied this basis for forfeiture in the ESCA. The Board reasonably concluded that, as a Bank employee, the Bank placed Plaintiff in special confidence and, therefore, Plaintiff was bound to act in good faith and in the best interest of the Bank. The Bank reasonably determined that Plaintiff violated this duty when he (1) "inappropriately took a profits and losses interest in the Nix cattle," (2) "failed to disclose

claim, and instead focuses on violations of the COC. Thus, the fact that the charges were dismissed, and whether they were dismissed due to jurisdictional or merits-based challenges, is not relevant to the Court's inquiry since the Board no longer relies on this as a basis for forfeiture.

[133] *Stroud v. Ozark Nat'l Life Ins*, 564 P.3d 725, 733 (Kan. 2025) (citation modified).

his financial relationship with Nix," (3) "when he became aware of the cattle losses at the Draper Feedlot, took steps to conceal those losses, and ultimately failed to disclose the losses to the Bank," and (4) "by telling Draper to sell his feedlot, impeding the Bank's ability to protect itself from losses on loans for cattle."[134]

Plaintiff next argues that it was unreasonable to find forfeiture based on this provision because any breach of fiduciary duty did not involve personal profit because the Bank did not suffer actual losses. First, Plaintiff's contention that the Bank must suffer "actual damages" is not the standard set forth in the ESCA. The fiduciary-duty provision states that the breach of fiduciary duty "involve[es] personal profit."[135] The Court finds that the Board reasonably applied this provision in finding that the breach of fiduciary duty involved personal profit. The fact that the business arrangement involved a risk of loss as well as profit (and in fact caused Plaintiff losses) does not mean his breach of fiduciary duty did not involve personal profit. Indeed, it was reasonable for the Board to conclude that Plaintiff's business arrangement, in which he had a stake in the potential profit of the cattle sales, was the driving force behind his breach of his fiduciary duty to disclose the true scope of his relationship with Nix, Feiling, and Draper, and to disclose to the Bank the cattle losses when he learned of them.

**d. Intentional Failure to Perform Stated Duties**

Finally, the Board based its for-cause finding on Plaintiff's intentional failure to perform the following duties based on his conduct with the Draper feedlot: (1) the duty to accurately report on the status of the Bank's loan; (2) the duty to keep sufficient records; (3) the duty of honesty to the Board and Bank; and (4) the duty to avoid self-dealing or at least disclose his

---

[134] Doc. 106-5 at 6–7.

[135] Doc. 107 at REM00005.

conflict of interest. The Court has already considered and rejected most of Plaintiff's challenges to these for-cause findings. Plaintiff argues that there is no document detailing what his "stated duties" were as a loan officer or a customer service representative, but the Court has already explained that Plaintiff was subject to these duties as part of the Bank's COC and in his role as an agent of the Bank. Plaintiff continues to argue that the Board failed to explain how he acted intentionally or when he violated these duties. But the Court has already explained that the Board reasonably determined that Plaintiff acted with intent based on the record before it. Later in this opinion, the Court also finds that the Board based these conclusions on substantial evidence.

**e. Ambiguity**

Finally, Plaintiff raises an interpretation argument that the Court must address: that the plan provision that defines cause is ambiguous and subject to interpretation; therefore, "the numerous conflicts [Plaintiff] identified must be considered in determining the interpretation."[136] As already discussed, the Court does not find that the Board's inherent conflict of interest impacted its decision on remand such that the Court must give it any more than minimal weight in its review.

Moreover, Plaintiff wholly fails to establish that the forfeiture clause is ambiguous. He provides no analysis, which would require him to acknowledge that "federal common law, governed by principles of trust law," applies, under which the Court must consider the "common and ordinary meaning as a reasonable person in the position of the plan participant would have

---

[136] Doc. 116 at 38 n.179. This argument is but another example of Plaintiff burying substantive challenges in footnotes despite the generous provision of excess pages to the parties for their six summary judgment briefs.

understood the words to mean."[137] When discussing the evidence about the Bank's policies, rules, and his duties, Plaintiff baldly asserts that "it was a vague, ambiguous, and admittedly overly broad policy, subject to a wide range of interpretations, which would not support a finding of cause."[138] This is insufficient to demonstrate ambiguity. "Ambiguity exists where a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term."[139] The fact that each of the "for-cause" showings are broad does not make them ambiguous. And Plaintiff fails to identify or demonstrate that any term in the provision is either susceptible to more than one meaning or that there is uncertainty as to the meaning of any one term.

In sum, the Board's termination decision was reasonable under the factors this Court is required to consider—it was part of a reasoned process, it was reasonable in light of external standards, and was consistent with the purposes of the Plan, as set forth in the forfeiture provision.

**2. Substantial Evidence**

The Court next considers whether there is substantial evidence to support the Board's decision.[140] Substantial evidence is "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker."[141] It "requires more than a scintilla but

[137] *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1237 (10th Cir. 2012) (quoting *Miller v. Monumental Life Ins.*, 502 F.3d 1245, 1249 (10th Cir. 2007)).

[138] Doc. 116 at 38.

[139] *Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1362 (10th Cir. 2009) (quoting *Miller*, 502 F.3d at 1250).

[140] *Adamson v. UNUM Life Ins. Co. of Am*., 455 F.3d 1209, 1212 (10th Cir. 2006).

[141] *Ian C. v. UnitedHealthcare Ins.*, 87 F.4th 1207, 1219 (10th Cir. 2023) (quoting *Sandoval v. Aetna Life & Cas. Ins.*, 967 F.2d 377, 382 (10th Cir. 1992)).

less than a preponderance."[142] In considering "whether the evidence in support of the administrator's decision is substantial, [the Court] must take into account whatever in the record fairly detracts from its weight.'"[143]

The Board made several factual findings to support its determination that grounds for cause existed at the time of Plaintiff's resignation in April 2020. The primary factual basis of all four for-cause findings was that Plaintiff "had engaged in self-dealing, fraud, and/or negligence at the Draper feedlot and in conjunction with the loans to Draper, Nix, and Feiling."[144] The Board specifically found "that Nix and [Plaintiff] had a secret arrangement that was not disclosed to the Bank, in which [Plaintiff] was granted an undisclosed interest in Nix's cattle, despite the fact that Nix was a customer of [the Bank] and his loan was (at one time) managed by [Plaintiff]."[145] The Board further found "that Draper was, at a minimum, aware of this arrangement, and assisted in concealing it at [Plaintiff's] direction."[146]

Plaintiff maintains the Board's decision was not based on substantial evidence and, therefore, was arbitrary and capricious. But again, substantial evidence does not mean that there is no evidence that could support a contrary finding.[147] Substantial evidence means more than a scintilla, but less than a preponderance.[148] And under this standard, the Board's findings were

---

[142] *Graham v. Hartford Life & Accident Ins.*, 589 F.3d 1345, 1358 (10th Cir. 2009).

[143] *Id.* (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)).

[144] Doc. 106-3 at 4.

[145] *Id.*

[146] *Id.*

[147] *See Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1134 (10th Cir. 2011) ("[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one." (quoting *Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006))); *Roganti v. Metro. Life Ins.*, 786 F.3d 201, 212 (2d Cir. 2015) ("[I]f the administrator has cited 'substantial evidence' in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious.").

[148] *See Eugene S.*, 663 F.3d at 1134.

sufficient. As the Board explained, its findings were based on (1) recorded interviews by KBI and FDIC investigators of Plaintiff, Nix, and Draper; (2) the KBI Affidavit; (3) checks written from and to Plaintiff and Nix's sale barn; and (4) statements from Bank staff summarizing the Bank's documents they reviewed and their first-hand accounts of events giving rise to the investigation. The Court has reviewed this evidence and agrees that the Board's findings are based on more than a scintilla of evidence that a reasonable mind could accept as true.[149]

As Defendants argue, Plaintiff's substantial-evidence challenges "flood the zone," at times conflating procedural and substantive issues. They fall into the following broad categories: (1) the Bank erred in not crediting Plaintiff's declarations because other witnesses who contradicted those statements were not credible; (2) the Board failed to produce evidence that he was subject to a fiduciary duty or a duty of candor toward the Bank; (3) the Bank erred in finding that Plaintiff's FIFO accounting method was part of a scheme to mislead the Bank; (4) there was no financial loss to the Bank, or gain to Plaintiff, associated with the Draper feedlot scheme; (5) Johnson and the Bank were aware of Plaintiff's relationship with Nix and Draper and approved of the FIFO accounting method he used until 2018; and (6) the Board erred by drawing an adverse inference from Plaintiff's failure to provide the Board with an interview after its termination decision on remand. The Court does not find that any of these challenges demonstrate that the Board's decision was arbitrary and capricious.

**First**, Plaintiff challenges the Board's credibility determinations. Plaintiff argues that it was erroneous for the Board to rely on his statements to the KBI during its investigation that were not made under oath. In contrast, the two declarations he submitted to the Board with his appeal letter were made under penalty of perjury and, to the extent there were conflicts, the

[149] *See id.*

Board should have credited the latter. He also argues that Johnson, King, and Shoemaker were not credible, and because much of the Board's decision on remand was based on their statements that conflicted with Plaintiff's declaration, the Board erred in crediting them. And he argues that Draper is a convicted felon, so the Board abused its discretion in crediting his statements to the KBI to the extent they conflicted with his own.

But the Court finds that the Board was well within its discretion to credit information in the KBI Affidavit over Plaintiff's statements. The KBI Affidavit was sworn under penalty of perjury and used to establish probable cause for the charges filed against Plaintiff. While the statements made to agents included in that affidavit may not have been sworn, Agent Brock swore that the facts included therein were true to the best of his knowledge based on the statements made to him. And the agents informed Plaintiff explicitly of the consequences of lying to them when they interviewed him. On remand, Board members could watch the videos in the record and make their own credibility determinations.

The Court rejects Plaintiff's objection to the extent he purports to argue that his post hoc declarations should have been given greater weight than his statements to agents during the investigation. That the charges were ultimately dismissed does not mean that they were not credible when made. The Logan County prosecutor's motion to dismiss did not indicate that the case lacked merit, and it was dismissed without prejudice.[150] The KBI Affidavit was based on a lengthy investigation during which the agents interviewed several witnesses, including Plaintiff, and reviewed documents. It was reasonable for the Board to rely heavily on it in making its decision to terminate Plaintiff's benefits under the Plan. It was also reasonable for the Board to

[150] The Board was also informed during the November meeting that the prosecutor's decision not to proceed with the charges was based on jurisdictional concerns.

give greater weight to the statements of other Bank officers as compared to Plaintiff. Shoemaker and King continue to work for the Bank and there is no evidence that suggests they did not provide accurate information to the Board.

As this Court has already repeatedly explained, while the Court "must take into account whatever in the record fairly detracts from" the weight of the Board's decision,"[151] credibility determinations are well within the province of the plan administrator's discretion.[152] And here, the Board clearly, consistently, and adequately explained its credibility assessment. In the termination letter on remand, the Board systematically addressed Plaintiff's objections prior to remand and explained why it found them not to be credible. And after providing Plaintiff with a full and fair opportunity to respond, it addressed his appeal arguments in its final denial letter. As to Draper, Nix, and Feiling's credibility, the Board "conclude[d] that no one involved in the criminal enterprise in this matter is particularly credible, but that the objective evidence supports the existence of a scheme between these individuals."[153] The letter further explained:

> [T]he KBI Report corroborates the existence of the Nix arrangement, and so does Crawford's prior conduct. Crawford also frequently relies upon the testimony of some of these individuals, including his reference to Draper's statement that he did not know how bad the death losses were until the very end. Finally, at a minimum, Draper's credibility concerns should have caused Crawford to more carefully monitor the Draper Feedlot, rather than simply take the word of someone with "documented legal problems." Crawford concedes that he used the FIFO system because "he lived over 200 miles away," and could not himself check the cattle. So, Crawford decided to rely upon the word of a criminal who he now argues is not credible. He cannot have it both ways. Nearly all individuals involved in the Draper Feedlot

---

[151] *Graham v. Hartford Life & Accident Ins.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)).

[152] *Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 705 (10th Cir. 2007).

[153] Doc. 106-5 at 19.

> now appear to be tainted, but the objective evidence nonetheless suggests an enterprise between them.[154]

The Court finds this explanation is reasonable and based on substantial evidence in the record.

**Second**, Plaintiff argues that there is not substantial evidence to support the Board's finding that he was bound by the Bank's Code of Conduct ("COC") when the Draper feedlot scheme occurred. He complains that the Board relied on a version of the COC from 2022 when it originally considered terminating the ESCA, which did not apply to him since he resigned in 2020. The Administrative Record includes four versions of the COC—those approved in 2014, 2016, 2018, and 2020, during Plaintiff's tenure at the Bank. All versions of the COC apply to "officers, directors, and other employees."[155] The Board also considered and gave weight to Johnson's declaration, in which he states that there were prior instances where Plaintiff was counseled about violating bank policy on conflicts of interest in 2017 and 2018. The 2018 incident caused Plaintiff's "lending authority [to be] totally revoked, as well as a significant reduction in his salary."[156] Also, in a recorded interview of Plaintiff included in the KBI file, he acknowledged that the Bank's policy prohibits self-dealing and conflicts of interest.

**Third**, Plaintiff argues that the FIFO method was not an incorrect method of accounting at the Draper feedlot, and that the Board failed to credit the cattle analysis he provided to it during the appeal. The minutes from both Board meetings and the termination and appeal letters demonstrate that the Board considered Plaintiff's arguments about the accounting method and did not find them to be credible.

---

[154] *Id.* (quoting Doc. 4 at 29, 32).

[155] *See* Doc. 107 at REM00015, REM00463, REM00468, REM00473.

[156] *Id.* at REM00455 ¶ 11.

Under the FIFO system of accounting used by Plaintiff when he was the loan officer on the Draper feedlot, the first cattle added to the lot would be the first cattle eventually sent to the feed barn or processing facility; the first cattle in would be the first cattle out. The Bank concluded that this was not an appropriate accounting system for Plaintiff to use in this instance, and, in fact, he was actually not using a true FIFO method of accounting. Instead, at the Draper feedlot, cattle were added to the lot at varying ages and weights, and then sent to the sale barn based upon their weight, not upon their order of addition to the Draper feedlot. The Board explained that this created an issue because lighter cattle remained at the feedlot for months, regardless of when they arrived, as the heavier cattle would go to the feed barn first, making a per-head count of the cattle essentially worthless. And most importantly, it found that this system allowed Nix and Draper to conceal the problems at the Draper feedlot, minimizing the impact of the cattle losses by continuing the sale of the heaviest cattle first.

The Board concluded based on statements from other loan officers who routinely work with these systems that in large lots that involve a single large loan, it would not be abnormal to use a FIFO system of accounting. But where the feedlot includes multiple loans, as with the Draper feedlot, the Bank should have used a "note-per-lot" method for the cattle loans, which would have allowed the Bank to monitor the specific cattle associated with the specific loan and "prove closeout profits and losses on those cattle (and the loan) on a timely basis."[157]

The Board rejected Plaintiff's contention that he received no training on the correct method of accounting on the basis that he was a "seasoned loan officer who oversaw numerous Bank loans that used the note-per-lot method of accounting," and because he fed his own cattle

[157] Doc. 106-5 at 4.

at the Draper feedlot.[158] To be sure, Plaintiff asserts in his declaration: "In my experienced opinion, I consider [the FIFO] method as an acceptable alternative to Specific Lot given Draper's history, my experience, the loan policy documents and the Bank's lack of specific rules and training regarding these issues, including accounting methods, inspections, and records."[159] But the Board acted within its discretion to disregard Plaintiff's opinion in favor of King and Shoemaker, who advised the Board at the April meeting that the FIFO system was inappropriate here and not in line with Bank policy. And it was reasonable for the Board to conclude that Plaintiff, in fact, was aware of this policy given his long history of managing such loans.

**Fourth**, Plaintiff argues that there is no evidence that the Bank lost money due to Plaintiff's conduct or that he profited from the scheme. Plaintiff asserts that his own declarations and appeal letter contradict the Bank's findings, which the Bank failed to address. But the Board's findings were based on substantial evidence, and, like many of the factual disputes raised by Plaintiff, involved a credibility determination that was well within the Board's discretion to make—whether to believe Plaintiff's declaration or other evidence in the record.

The Board repeatedly explained in its letters and again in the summary judgment briefs that the Bank's interest in its collateral was impaired due to the Draper feedlot scheme. The Bank was the primary mortgagor of the property, which was sold in a short sale due to Plaintiff's tip to Draper. Although Draper paid off the mortgage, the short sale extinguished any remaining equity in the property. And title to the property was then re-conveyed to Draper's son. Also, the

[158] *Id.* According to Tuck's December 15, 2021 letter, Plaintiff "grew his loan portfolio to a point where his portfolio reached approximately $100 million, $40 million of which was directly related to cattle lending." Doc. 107 at REM00105. *See also* Doc. 109-4 at 86–87 ¶ 4.

[159] Doc. 109-4 at 99 ¶ 17.

Bank lost its ability to protect its interest in the cattle due to Plaintiff's failure to inform the Bank about the missing cattle until it was too late.

Plaintiff also maintains that he in fact lost money through his relationship with Nix, which contradicts the Board's conclusion that he was self-dealing. He contends that there was no self-dealing, but that he merely had a "marketing arrangement" with Nix. But, again, the Board rejected Plaintiff's explanation and cited other evidence in the record for its finding that Plaintiff was self-dealing and stood to gain by not disclosing the arrangement to the Bank. The KBI Affidavit supported the Board's conclusion, and it was executed after KBI agents interviewed Plaintiff, Draper, and Nix. Nix told KBI agents that their arrangement lasted beyond 2016, and was still in effect through 2019. Draper told agents about the extent of Plaintiff's arrangement with Nix. The Board therefore had before it more than a scintilla of evidence that Plaintiff stood to gain from his business arrangement with Nix and Draper. The Board considered and rejected Plaintiff's post hoc statements to the contrary in his declarations. The Court does not second-guess those findings; the Board has discretion to make determinations about the claimant's credibility.[160]

**Fifth,** as a defense to several of the grounds for cause, Plaintiff insists that the Board ignored evidence that Johnson was aware of his relationship with Nix and Draper, and that the Bank approved of the FIFO method he used for accounting on the Draper feedlot until Johnson directed that a note-per-lot method be used. Again, Plaintiff questions the Board's credibility determinations. And there is no evidence that the Board ignored evidence of Johnson's knowledge. The administrative record makes clear that the Board considered this evidence but

---

[160] *See Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 705 (10th Cir. 2007).

ultimately rejected it. The Board's decision was reasonable and based on more than a scintilla of evidence.

**Sixth**, and finally, Plaintiff suggests that it was erroneous for the Board to draw an adverse inference based on his alleged failure to cooperate on remand; specifically, his failure to allow the Board to interview him and to turn over documents. But the Board made clear in its final denial letter, and in its summary-judgment briefing, that while it drew a negative inference *after* its denial letter on remand from the fact that Plaintiff declined to be interviewed by the Board, its decision on appeal was not driven by that inference. Thus, the Court finds that Plaintiff's refusal to be interviewed did not make a difference in the Board's ultimate decision.

## V. Conclusion

The Court has now considered Plaintiff's ERISA claim twice. In its first review, the Court concluded that the Board's interpretation of the Plan that it could terminate Plaintiff's benefits if it determined that grounds for termination with cause existed at the time he resigned was reasonable. On remand, Defendants addressed the procedural problems the Court identified in its May 2024 Order. The Board addressed the internal investigation that it conducted in 2021, and created a more robust record of its proceedings for the Court's review. The Court is satisfied on this second review that Plaintiff has received the full and fair administrative review required by ERISA, that the Board's inherent conflict of interest did not play a role in its decision, and that the Board's decision was not arbitrary and capricious. Thus, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment on Plaintiff's ERISA claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Joint Motion for Summary Judgment (Doc. 105) is **granted**, and Plaintiff's Motion for Summary Judgment (Doc.

109) is **denied**. Defendants are directed to file either a stipulation of dismissal of their counterclaims or a status report discussing the status of the counterclaims by no later than **August 31, 2026**.

**IT IS SO ORDERED.**

Dated: August 20, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE